630 So.2d 714 (1994)
Andrea E. SEGURA
v.
Melissa A. FRANK, et al.
Matthew REY
v.
Wendy GUIDRY, et al.
Nos. 93-C-1271, 93-C-1401.
Supreme Court of Louisiana.
January 14, 1994.
*716 John A. Keller, Lafayette, Ben L. Day, Carey J. Guglielmo, Baton Rouge, for applicant in No. 93-C-1271.
William F. Page, Jr., Lafayette, Michael P. Corry, Joseph E. Windmeyer, Metairie, for respondent in No. 93-C-1271.
Ben L. Day, Baton Rouge, Jeffery P. Lozes, New Orleans, for applicant in No. 93-C-1401.
Jacqueline R.A. Campbell, Thomas E. Campbell, Metairie, for respondent in No. 93-C-1401.
KIMBALL, Justice.[*]
The issue in these consolidated cases is whether either of two amendments to La. R.S. 22:1386, the "nonduplication of recovery" provision of Louisiana's Insurance Guaranty Association Law, apply to claims arising from accidents which occurred prior to the effective dates of the amendments. The courts of appeal reached opposite conclusions in these cases, while other appellate courts have rendered conflicting decisions on the same issue as well. We granted writs to resolve the split of opinion among the circuits.

FACTS
On August 1, 1989, Matthew Rey was injured when his car was struck by an automobile driven by Wendy Guidry. Rey filed suit on July 30, 1990 against Guidry, Dixie Lloyds Insurance Company as Guidry's liability insurer, and Allstate Insurance Company as Rey's uninsured motorist (UM) carrier. After Dixie Lloyds was liquidated on December 20, 1990, Rey amended the petition to name the Louisiana Insurance Guaranty Association (LIGA) as Dixie Lloyds' successor.
Andrea Segura was injured on March 12, 1990 when she was struck in a pedestrian crosswalk by an automobile driven by Russell Goodie and owned by Melissa Frank. Segura filed suit on March 4, 1991 against Goodie, Frank, American Manufacturers Mutual Insurance Company (American) as Segura's *717 UM carrier, and LIGA as successor to Dixie Lloyds, the liability insurer of the Frank vehicle on the date of the accident.
In both cases, LIGA argued La.R.S. 22:1386, as amended by Act 130 of 1990 and which had become effective on September 7, 1990,[1] required the plaintiffs to exhaust their UM coverages before recovering against LIGA. Both trial courts disagreed with LIGA, applied the law as it existed prior to the amendment, and held LIGA primes the plaintiffs' UM insurers. LIGA appealed both judgments, this time arguing in the alternative that even if Act 130 of 1990 did not apply to plaintiffs' claims, Act 237 of 1992 did apply. The 1992 Act had again amended and reenacted La.R.S. 22:1386 with only one change pertinent to these cases: Section 3 of the Act provided that the amendment applied to all covered claims pending on the effective date of the Act, June 10, 1992.[2] LIGA thus argued on appeal the 1992 amendment applied to plaintiffs' "pending" claims and therefore its obligations to plaintiffs were subordinate to the obligations of plaintiffs' UM insurers. In response to LIGA's arguments, American and Allstate argued retroactive application of either Act 130 of 1990 or Act 237 of 1992 would violate the due process and contract clauses of the federal and state constitutions by impairing their contractual obligations under the UM policies and by disturbing Rey's and Segura's vested rights against LIGA.
In Segura v. Frank,[3] the Louisiana Third Circuit Court of Appeal affirmed the judgment of the trial court. Rejecting LIGA's argument that Act 130 of 1990 applied, the court concluded the 1990 amendment was substantive and therefore should apply prospectively only.[4] The court reasoned that Segura's claim against Dixie Lloyds was a vested property right which arose prior to the effective date of the 1990 amendment. Thus, reasoned the court, retroactive application of the amendment to the date of the accident would disturb Segura's vested right in a cause of action against LIGA as Dixie Lloyds' successor.[5] To avoid that result, the court applied the prior version of La.R.S. 22:1386 as interpreted by this court in Hickerson v. Protective National Insurance Co., 383 So.2d 377, 379 (La.1980), where we construed the law "to deem LIGA the insurer with all the obligations of the insolvent insurer." The Segura court further reasoned that this case was analogous to the situation in St. Paul Fire and Marine Insurance Co. v. Smith, 609 So.2d 809, 813 (La.1992), where we classified as substantive an amendment which was "an obvious legislative attempt to change the law as construed by this court."
Regarding LIGA's alternative argument that the 1992 amendment applied, the court of appeal first noted Act 237 of 1992 had not yet been passed at the time of the proceedings in the trial court, therefore the Act "could not have been considered by the trial judge, much less applied to these proceedings." The court reasoned that "in the normal scheme of events" the applicability of the 1992 amendment should not be argued for the first time on appeal. Despite this reasoning, the court went on to find that "in any event" the trial court's judgment "relieved American of responsibility for the first $10,000 of plaintiff's damages and to that extent *718 constitutes an adjudicated claim." The court concluded that "under the particular circumstances of this case, the claim in this matter is not a `pending claim' within the purview of Section 3 of Act 237 of 1992."
In the second case, Rey v. Guidry,[6] the Louisiana Fifth Circuit Court of Appeal reversed the trial court's judgment. Contrary to the reasoning of the third circuit in Segura, the fifth circuit in Rey determined both amendments to La.R.S. 22:1386 were procedural and interpretive rather than substantive. According to the fifth circuit, the amended statute is procedural because it "does not diminish Rey's right to recovery, merely establishes a new procedure for his recovery." Additionally, the court found the amendments did not create a new rule but simply established legislative intent as to the meaning of the statute from its inception. The amendments therefore were interpretive "[i]n light of the jurisprudence interpreting the earlier version of the Statute," referring to this court's decision in Hickerson.
The court in Rey also determined that the "time for vesting of rights" was the date of Dixie Lloyds' insolvency, which occurred after the 1990 amendment's effective date, as opposed to the date of the accident, which occurred prior to that date.[7] Finding that "any right Rey may have had against LIGA on the date of the accident was conditional, contingent that Dixie Lloyds be liquidated before a claim against LIGA would be viable," the court concluded Rey had no vested right in a cause of action against LIGA on the effective date of the 1990 amendment. Thus, Rey's vested rights would not be impaired by application of the amended statute to his claim.
Finally, the Rey court determined Rey's claim was "pending" in the trial court on the effective date of Act 237 of 1992 and therefore the 1992 amendment applied retroactively to his claim pursuant to Section 3 of the Act.[8] The court reasoned that because "LIGA was statutorily created, and embodied by sovereign authority of our State to limit economic exposure when it is necessary to protect the security of our citizenry," the legislature's enactment of Act 237 of 1992, including the retroactivity provision in Section 3, was a legitimate exercise of the state's protective powers. Applying La.R.S. 22:1386(A) as amended by the 1992 Act, the court held Allstate's UM coverage primes LIGA's coverage of Rey's claim.
Allstate applied to this court for review of the fifth circuit's decision in Rey; LIGA applied for review of the third circuit's decision in Segura. We granted both applications and consolidated the two cases.[9]

LAW
The Louisiana Insurance Guaranty Association Law (LIGA Law)[10] states its purpose as follows:
The purpose of this Part is to provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, to assist in the detection and prevention of insurer insolvencies and to allow the association to provide financial assistance to member insurers under rehabilitation or liquidation, and to provide an association to assess the cost of such operations among insurers.
La.R.S. 22:1376.
To achieve the LIGA Law's stated purpose, the legislature created LIGA as a private *719 nonprofit unincorporated legal entity governed by a board of directors and composed of "member insurers." La.R.S. 22:1380(A). "Member insurer" is defined as any person who "[i]s licensed and authorized to transact insurance in this state" and who has written at least one policy of insurance since September 1, 1970, the effective date of the LIGA Law. La.R.S. 22:1379(5). All member insurers "shall be and remain members of the association as a condition of their authority to transact insurance in this state." La.R.S. 22:1380(A).
La.R.S. 22:1382 defines LIGA's powers and duties in pertinent part as follows:
A. The association shall:
(1)(a) Be obliged to the extent of the covered claims existing prior to the determination of the insurer's insolvency, or arising after such determination....
(2) Be deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent....
At the time of each accident in these cases, La.R.S. 22:1379(3) defined a "covered claim" as
an unpaid claim, including one for unearned premiums by or against the insured or agent, which arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy to which this Part applies issued by an insurer, if such insurer becomes an insolvent insurer after September 1, 1970, and (a) the claimant or insured is a resident of this state at the time of the insured event; or (b) the property from which the claim arises is permanently located in this state. "Covered claim" shall not include any amount due any reinsurer, insurer, insurance pool, or underwriting association, as subrogation recoveries or otherwise. "Covered claim" shall not include any amount due under or arising from a bail bond contract.
Also at the times of the accidents, the "nonduplication of recovery" provision, La. R.S. 22:1386, provided in pertinent part:
§ 1386. Nonduplication of recovery
(1) Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall be required to exhaust first his right under such policy. Any amount payable on a covered claim under this Part shall be reduced by the amount of any recovery under such insurance policy.
According to this court in Hickerson v. Protective National Insurance Co. v. Smith, 383 So.2d 377, 379 (La.1980), La.R.S. 22:1386 "was designed to apply to ordinary insurance coverage and not to uninsured motorist coverage, which is required by public policy." Noting the stated purpose of the LIGA Law is "to avoid financial loss to claimants or policyholders,"[11] the court reasoned this purpose would be thwarted by requiring an injured party to proceed first against his or her own UM insureronce the injured claimant recovered from his UM insurer, the UM insurer would be subrogated to the claimant's rights against the unprotected policyholder of the insolvent insurer.[12] The court thus held that the only statutory interpretation which would effect the purpose of the LIGA Law would be "to deem LIGA the insurer with all the obligations of the insolvent insurer." Hickerson, 383 So.2d at 379 (citing La.R.S. 22:1382(1)).[13] The court also reasoned that because the insolvent insurer was "able to make payment by dint of its membership in the Louisiana Insurance Guaranty Association," therefore the tortfeasor's automobile was not an "uninsured motor vehicle" within the meaning of La.R.S. 22:1406(D)(2)(a).[14]Id. at 380.
*720 Ten years after the decision in Hickerson and shortly after the accidents in these cases, the legislature passed Act 130 of 1990, which amended La.R.S. 22:1386 to read as follows:
§ 1386. Nonduplication of recovery
(1) Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall be required first to exhaust his rights under such policy. Such other policies of insurance shall include but shall not be limited to liability coverage, uninsured or underinsured motorist liability coverage, or both, hospitalization, and other medical expense coverage. Any amounts payable by such other insurance shall act as a dollar-for-dollar credit against any liability of the association under this Part.
(Emphasis added.) In direct contrast to prior law as construed by this court in Hickerson, the 1990 amendment to La.R.S. 22:1386 clearly required an injured claimant to first exhaust his UM coverage before recovering against LIGA.
In the same legislative session, the legislature also addressed the Hickerson court's concern that in the event the claimant would be required to exhaust his or her UM coverage before proceeding against LIGA, then the UM insurer would assert the claimant's subrogated claim against the unprotected policyholder of the insolvent insurer. In Act 105 of 1990, the legislature amended the definition of the term "covered claim" in La.R.S. 22:1379(3) in pertinent part by adding the following italicized language:
(b) "Covered claim" shall not include any amount due any reinsurer, insurer, insurance pool, or underwriting association, as subrogation recoveries or otherwise. In addition, the insured of an insolvent insurer shall likewise not be liable for any subrogation claim asserted by any reinsurer, insurer, insurance pool, or underwriting association to the extent of the applicable liability limits previously provided to such insured by the insolvent insurer.

(Emphasis added.) Under the amended definition, the insured of an insolvent insurer is immune to subrogation claims asserted by a claimant's UM insurer to the extent of the applicable policy limits previously provided by the insolvent insurer, thus effecting the LIGA Law's purpose of avoiding "financial loss to claimants or policyholders because of the insolvency of an insurer." La.R.S. 22:1376.
Both 1990 amendments became effective on June 29, 1990. Two years later, the legislature again amended La.R.S. 22:1386, the "nonduplication of recovery" provision, by Act 237 of 1992. In that Act, the only change pertinent to these cases is contained in Section 3 of the Act, which provides: "This Act shall apply to all covered claims, as defined in R.S. 22:1379, pending on or arising on or after the effective date of this Act" (emphasis added).[15] Act 237 of 1992 became effective on June 10, 1992.

ANALYSIS
These cases require us to decide (1) whether La.R.S. 22:1386 as amended by Act 130 of 1990 applies to the plaintiff's claim in each case, or (2) if not, whether the statute as amended by Act 237 of 1992 applies.
In determining whether laws may be applied retroactively, we are guided by La. C.C. art. 6, which provides:
In the absence of contrary legislative expression, substantive laws apply prospectively *721 only. Procedural and interpretive laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary.[16]
This court recently explained the application of La.C.C. art. 6 in Cole v. Celotex Corp., 599 So.2d 1058, 1063 (La.1992):
LSA-C.C. Art. 6 requires that we engage in a two-fold inquiry. First, we must ascertain whether in the enactment the legislature expressed its intent regarding retrospective or prospective application. If the legislature did so, our inquiry is at an end. If the legislature did not, we must classify the enactment as substantive, procedural or interpretive.
Additionally, this court has observed that the principle contained in La.C.C. art. 6 has constitutional implications under the due process and contract clauses of both the United States and Louisiana Constitutions.[17]See St. Paul Fire & Marine Ins. Co. v. Smith, 609 So.2d 809, 816 n. 11 (La.1992); Board of Comm'rs v. Dept. of Natural Resources, 496 So.2d 281, 291 (La.1986); Cahn v. Cahn, 468 So.2d 1176, 1181 (La.1985); Graham v. Sequoya Corp., 478 So.2d 1223, 1226 (La.1985); Terrebonne v. South Lafourche Tidal Control Levee Dist., 445 So.2d 1221, 1224 (La.1984); Block v. Reliance Ins. Co., 433 So.2d 1040, 1044 (La.1983); Lott v. Haley, 370 So.2d 521, 523 (La.1979); Burmaster v. Gravity Drainage Dist. No. 2, 366 So.2d 1381, 1387 (La.1978). Thus, even where the legislature has expressed its intent to give a substantive law retroactive effect, the law may not be applied retroactively if it would impair contractual obligations or disturb vested rights. Id.
Accordingly, for either amendment to apply to plaintiffs' claims in these cases, it must meet the foregoing requisites.

(1) The 1990 Amendment
Rey and Segura were injured on August 1, 1989 and March 12, 1990, respectively; Act 130 of 1990, amending La.R.S. 22:1386, became effective on June 29, 1990; and Dixie Lloyds, the tortfeasors' liability insurer, was declared insolvent on December 20, 1990. Under La.R.S. 22:1386 as it existed on the dates of the accidents, Rey and Segura would be entitled to proceed immediately against LIGA as Dixie Lloyds' successor. Under the statute as it existed on the date of Dixie Lloyds' liquidation, they would first have to exhaust their UM coverages with American and Allstate before proceeding against LIGA.

(a) Retroactive Effect of the Amendment
LIGA argues the issue in these cases is not whether the 1990 amendment should be given retroactive or prospective effect, but whether the law as it existed on the dates of the accidents or on the date of Dixie Lloyds' liquidation should apply. According to LIGA, retroactivity is not at issue because neither Rey nor Segura could have a vested right in a cause of action against LIGA until Dixie Lloyds was declared insolvent, which occurred after the amendment's effective date.[18] Thus, argues LIGA, the only rights affected by the amendment are those which arose after the amendment became effective. As LIGA points out, the court of appeal in Rey employed similar reasoning to conclude that on the effective date of the amendment, Rey had no vested rights against LIGA to be impaired. LIGA also points out that its position was upheld by the first circuit in Hebert v. Liner, 620 So.2d 294, 296 (La.App. 1st Cir.1993), a case on all fours with the present cases, where the court stated:
*722 La.R.S. 22:1386 does not purport to affect plaintiff's rights against the insurer itself. It governs plaintiff's rights against LIGA. Until Dixie Lloyds was declared insolvent, plaintiff had no vested rights against LIGA, although he may have had vested rights against Dixie Lloyds. The court finds, therefore, that the law as it existed at the time Dixie Lloyd's was declared insolvent must govern LIGA's obligation. This interpretation of La.R.S. 22:1386 does not give the amendment retroactive effect.
In further support of its position that the 1990 amendment would not operate retroactively in the present cases, LIGA relies primarily on LIGA v. Guglielmo, 276 So.2d 720 (La.App. 1st Cir.), writ denied, 279 So.2d 690 (1973).[19] In Guglielmo, the first circuit held LIGA liable for claims against two insurers declared insolvent after the effective date of the Act which created LIGA even though the claims arose prior to the Act's effective date. Finding that claims do not "become the liability of the Association until and unless an insurer is decreed insolvent," the appellate court concluded "the Act intends that the decreeing of an insurer insolvent after its effective date is the sole operative factor upon which the Association's liability attaches." Id. at 726. The court reasoned that under this interpretation, the Act would operate "prospectively only because, by its own terms, it applies solely to insolvencies decreed subsequent to the date it becomes effective." Id.
While we express no opinion regarding the correctness of the first circuit's decision in Guglielmo, we note significant factual distinctions between that case and these cases. In Guglielmo, the court observed that under the facts of that case, application of the Act would not "create any new obligation or exposure, either in character or amount, upon any Association member under its own policies." Id. at 727 (emphasis added). In contrast, application of the 1990 amendment in the present cases would impose new obligations upon two LIGA members, American and Allstate, under the UM policies which were in effect on the dates of the accidents.
Thus, we disagree with LIGA's contention that application of the 1990 amendment to Rey's and Segura's claims would operate prospectively only. LIGA's reasoning, as well as the reasoning of the fifth circuit in Rey and the first circuit in Hebert, fails to take into account the amendment's effects on the existing rights and obligations of the UM insurers.[20] Those rights and obligations arose not on the date of insolvency, nor on the dates of the accidents, but on the dates the UM policies were issued. As we stated in Block v. Reliance Ins. Co., 433 So.2d 1040, 1044 (La.1983) (emphasis added):
Where the statute in question was not in effect at the time of contracting, it cannot be retroactively applied to alter the obligations of that contract, even though the act giving rise to the obligation occurs *723 after the effective date of the statute.[21]
Here, at the times the American and Allstate UM policies were issued, La.R.S. 22:1386 and Hickerson limited the UM insurers' liability under those policies to claims in excess of a tortfeasor's liability insurance coverage even in the event of the insolvency of the tortfeasor's insurer. If, however, the 1990 amendment to La.R.S. 22:1386 is applied, under those same policies the UM insurers would be primarily liable for plaintiffs' claims against Dixie Lloyds. In other words, the amendment would retroactively increase the UM insurers' obligations under the policies. Moreover, because generally a statute cannot be retroactively applied to alter the obligations of a contract "even though the act giving rise to the obligation occurs after the effective date of the statute," id., the fact that Dixie Lloyds' liquidation occurred after the effective date of the amendment does not preclude our finding that application of the 1990 amendment would retroactively increase the UM insurers' obligations under policies issued prior to the amendment's effective date.
Thus, we conclude Act 130 of 1990 would operate retroactively in these cases.

(b) Classification of the Amendment as Procedural, Interpretive, or Substantive
Having settled that the 1990 amendment would have retroactive effect on American's and Allstate's obligations under the UM policies, we now must determine whether retroactive application of the statute is permissible. The first inquiry under La.Civ. Code art. 6 and Cole, supra, is whether the legislature expressed its intent regarding retroactive or prospective application. In Act 130 of 1990, the legislature expressed no such intent. The next inquiry, therefore, is whether the enactment is substantive, procedural, or interpretive.
Substantive laws establish new rules, rights, and duties or change existing ones. St. Paul Fire & Marine Ins. Co. v. Smith, 609 So.2d 809, 817 (La.1992); Ardoin v. Hartford Acc. & Indem. Co., 360 So.2d 1331, 1339 (La.1978). Procedural laws prescribe a method for enforcing a substantive right and relate to the form of the proceeding or the operation of the laws. Graham v. Sequoya Corp., 478 So.2d 1223, 1226 (La. 1985); Terrebonne v. South Lafourche Tidal Control Levee Dist., 445 So.2d 1221, 1224 (La.1984). Interpretive laws merely establish the meaning the interpreted statute had from the time of its enactment. St. Paul Fire & Marine, 609 So.2d at 817; Ardoin, 360 So.2d at 1339.
The court of appeal in Rey found the 1990 amendment to La.R.S. 22:1386 procedural because it merely established a new procedure for Rey's recovery without diminishing his right to recovery. The court of appeal in Segura, on the other hand, found the amendment substantive because "a retroactive application would disturb plaintiffs' vested property right, i.e., a cause of action in favor of the injured parties." While we agree with the Segura court that a "cause of action is a vested property right which is protected by the guarantee of due process," Burmaster v. Gravity Drainage Dist. No. 2, 366 So.2d 1381, 1387 (La.1979),[22] we find retroactive application of the 1990 amendment in these cases would disturb neither plaintiff's vested right in a cause of action against the party or parties legally liable for their injuries. From the plaintiffs' standpoint, the amendment alters *724 the order of recovery from defendants without disturbing the right to recover.[23] In other words, the amendment merely prescribes a method for enforcing the plaintiffs' rights to recover. Accordingly, insofar as the 1990 amendment's effect on plaintiffs' rights is concerned, we agree with the Rey court's conclusion that the amendment is procedural.
Again, however, we note neither the Rey nor the Segura court considered the 1990 amendment's effect on the UM insurers' rights and obligations.[24] As previously determined, the 1990 amendment would retroactively affect Allstate's and American's substantive contractual rights by increasing their obligations to plaintiffs under existing UM policies. Thus, even though the 1990 amendment would affect plaintiffs' procedural rights only and not their substantive rights, the amendment clearly would affect the UM insurers' substantive rights. The amendment therefore is not "merely procedural" and the court of appeal in Rey erred in finding otherwise.
The lower court in Rey also found the 1990 amendment interpretive. The court reasoned that the amendment did not create a new rule but simply established the meaning La.R.S. 22:1386 had from the time of its original enactment in 1970. Thus, the Rey court suggested the amendment merely "legislatively overruled" this court's interpretation of the statute in Hickerson.[25] If the Rey court is correct that the 1990 amendment is merely interpretive, then the amendment "cannot properly be said to divest vested rights [or impair contractual obligations], because, under civilian theory, such legislation does not violate the principle of non-retroactivity of laws.... It is the original statute, not the interpretive one, that establishes rights and duties." Gulf Oil Corp. v. State Mineral Bd., 317 So.2d 576, 591 (La.1975) (citing 1 M. Planiol, Treatise on the Civil Law, § 251 at 179 (La.St.L.Inst. trans. 1959), and A. Yiannopoulos, Louisiana Civil Law System, § 32.5 at 18 (1975 Supp.)).[26]
This court considered the nature of interpretive legislation in St. Paul Fire & Marine Ins. Co. v. Smith, 609 So.2d 809 (La.1992). In that case, the issue was whether an amendment to La.R.S. 23:1103(B) of the Louisiana Worker's Compensation Law was interpretive or substantive. The court noted that prior to the amendment, "`existing' Louisiana law as interpreted and construed by the state's highest court unequivocally recognized the employee's right to retain his general damage award by excepting that award from the employer's preferential right to reimbursement." Id. at 820. The court then held the legislature's amendment of that law to give an employer first payment for worker's compensation paid out of any damages recovered by an employee from a third party was "clearly substantive in that it significantly alters the respective rights of the injured employee and the employer (or compensation insurer)." Id. Reaffirming the principle that "`[a] statute that changes settled law relative to substantive rights only has prospective effect,'" the court observed that "while there is a category of legislation labeled `interpretive,' legislation that changes *725 settled law falls outside of that category." Id. (quoting Gilboy v. American Tobacco Co., 582 So.2d 1263, 1265 (La.1991) (emphasis supplied by quoting court)). In concluding the amendment to La.R.S. 23:1103(B) was substantive, the court found it significant that the amendment was a delayed rather than a "prompt" legislative response to this court's previous interpretations of the statute, that the parties had relied on the line of jurisprudence interpreting the statute, and that the amendment was part of an overall revision of the worker's compensation laws. Id. at 820-21.
When American and Allstate issued the UM policies to Segura and Rey, La.R.S. 22:1386 as construed by this court in Hickerson recognized a UM insurer's right to rely on LIGA's coverage of an insured's claims in the event a tortfeasor's liability insurer was declared insolvent. The legislature's amendment of that statute, if applied in these cases, would significantly alter the respective rights and obligations of LIGA and the UM insurers by making the UM insurers primarily liable for plaintiffs' claims against Dixie Lloyds. Furthermore, prior to the 1990 amendment to La.R.S. 22:1386, the Hickerson court's interpretation of the statute had been the law of this state for over a decade. For these reasons, we conclude the 1990 amendment changed settled law relative to American's and Allstate's substantive rights and therefore falls outside the category of interpretive legislation. Additionally, we note that at the same time the legislature amended La.R.S. 22:1386, it also amended the definition of "covered claim" in La.R.S. 22:1379(3) in order to protect policyholders of insolvent insurers against subrogation claims asserted by claimants' UM insurers.[27] If the amendment to La.R.S. 22:1386 had been merely interpretive, there would have been no reason to amend La.R.S. 22:1379(3) in order to protect policyholders who previously had no exposure to such subrogation claims.
In sum, the 1990 amendment to La.R.S. 22:1386 is neither procedural nor interpretive but substantive. Since the legislature expressed no intent in Act 130 of 1990 that the amendment apply retroactively, under La. C.C. art. 6 the amendment applies prospectively only. Accordingly, we hold the 1990 amendment does not apply to Rey's and Segura's claims.

(2) The 1992 Amendment
Before reaching the issue of whether the 1992 amendment applies to plaintiffs' claims, we must address a threshold issue raised by the third circuit in its opinion in Segura. The third circuit noted that at the time of the proceedings in the trial court, Act 237 of 1992 had not yet been passed and "could not have been considered by the trial judge, much less applied to these proceedings." The court concluded that "in the normal scheme of events" the applicability of the 1992 amendment should not be argued for the first time on appeal.[28] If the third circuit is correct, then we need not consider LIGA's argument that the 1992 amendment applies.
The general rule is that appellate courts will not consider issues raised for the first time on appeal. See, e.g., Fried v. Bradley, 219 La. 59, 87, 52 So.2d 247, 257 (1950), and cases cited therein. Another general rule, however, is that an appellate court is bound to adjudge a case before it in accordance with the law existing at the time of its decision. See Dripps v. Dripps, 366 So.2d 544 (La.1978), and cases cited therein. Where the law has changed during the pendency of a suit and retroactive application of the new law is permissible, the new law applies on appeal even though it requires reversal of a trial court judgment which was correct under the law in effect at the time it was rendered. See id. at 547-48. Needless to say, where the law has changed after the trial court's decision, the applicability of the new law can be argued for the first time only on appeal.
Thus, contrary to the third circuit's reasoning in Segura, the fact that LIGA argued the applicability of the 1992 amendment for the first time on appeal does not relieve us of *726 our duty to consider the merits of the argument. We therefore proceed to determine whether the 1992 amendment applies to plaintiffs' claims.
The relevant provision of La.R.S. 22:1386 as amended by Act 130 of 1990 was reenacted without change in Section 2 of Act 237 of 1992.[29] Thus, if we find the 1992 amendment applies to Rey's and Segura's claims pursuant to the retroactivity provision in Section 3 of the 1992 Act, the result will be the same as if the 1990 Act had appliedi.e., American's and Allstate's UM coverages will prime LIGA's coverage. Like the 1990 amendment, the 1992 amendment would change settled law relative to the UM insurers' substantive rights and would significantly alter the respective rights and obligations of the UM insurers and LIGA. We therefore find the 1992 amendment substantive for the same reasons we found the 1990 amendment substantive.[30]
Section 3 of Act 237 of 1992 provides: "This Act shall apply to covered claims, as defined in R.S. 22:1379, pending on or arising on or after the effective date of this Act" (emphasis added). Section 3 constitutes an expression of legislative intent regarding retroactive application of the statute as amended and reenacted by the 1992 Act. See La. C.C. art. 6; Cole, 599 So.2d at 1063. Accordingly, even though the 1992 amendment, like the 1990 amendment, is substantive, unlike the 1990 amendment it will apply retroactively to Rey's and Segura's claims if two requisites are met in each case: first, each claim must have been "pending" on June 10, 1992, the effective date of Act 237 of 1992; second, retroactive application of the amendment must not violate the federal and state constitutional prohibitions against impairment of contractual obligations or disturbance of vested rights.[31]

(a) Pendency of Plaintiffs' Claims
In deciding whether the plaintiffs' claims were "pending" within the meaning of Section 3 of Act 237 of 1992, both courts of appeal focused on the dates of the adjudications in the trial courts in relation to the effective date of the 1992 Act. Thus, the third circuit in Segura concluded that on June 10, 1992, the effective date of the Act, plaintiff's claim was not a "pending claim" but an "adjudicated claim."[32] The court reasoned as follows:
[W]e find that the liability of LIGA vis-a-vis American which was adjudicated by the trial court in the consolidated hearing of October 21, 1991, relieved American of responsibility for the first $10,000 of plaintiff's damages and to that extent constitutes an adjudicated claim. In sum, we conclude that, under the particular circumstances of this case, the claim in this matter is not a "pending claim" within the purview of Section 3 of Act 237 of 1992.
In contrast, the fifth circuit in Rey concluded Rey's claim was a "pending claim" on June 10, 1992 because even though the trial court had granted a partial summary judgment in favor of Allstate on May 20, 1992, "the adjudication vis-a-vis Allstate was not final until October 5, 1992" when the trial court ruled in favor of Rey and against LIGA.
This court considered the nature of a "pending" lawsuit in Hebert v. Doctors Memorial Hospital, 486 So.2d 717 (La.1986). In that case, the issue was whether a suit against a hospital was "pending" within the meaning of La.C.C. art. 3463 so as to continue interruption of prescription against a solidary obligor.[33] In support of an exception of prescription, the solidary obligor, a physician, *727 argued the suit ceased to be "pending" on the date the plaintiff executed a release in his favor, thus allowing prescription to commence running from that date as opposed to the later date on which the trial court signed a judgment dismissing the hospital. Consulting Black's Law Dictionary (5th ed. 1979) at page 1021, the court found
that "an action or suit is `pending' from its inception until the rendition of final judgment." It defines "Pendency" at page 1020, as the "state of an action, etc., after it has begun and before the final disposition of it." And final disposition connotes a state of affairs "such that nothing further remains to fix the rights and obligations of the parties." The commonly understood meaning of the word in a legal context is appropriate.
Hebert, 486 So.2d at 720. The court concluded "a suit is pending until a final judgment dismissing it has been filed." Id. at 721. "Surely," reasoned the court, "until that suit is dismissed, the existence, validity and/or binding nature of the release is subject to judicial scrutiny." Id.
The issue "subject to judicial scrutiny" in the present cases concerns the allocation of liability for plaintiffs' "covered claims." If plaintiffs' claims were "pending" on the effective date of Act 237 of 1992, then La.R.S. 22:1386 as amended would allocate primary liability for those claims to the UM insurers, American and Allstate. If the claims were not "pending," the old law would apply making LIGA primarily liable. Thus, something further remains to fix the rights and obligations of the parties within the meaning of the term "pending" as defined in Hebert.
We also find it significant that on June 10, 1992, the effective date of Act 237 of 1992, neither the judgment rendered by the trial court in Rey, nor that rendered by the trial court in Segura, were res judicata. Under the law of res judicata applicable in Rey,[34] "[a] final judgment is definitive when it has acquired the authority of the thing adjudged." La.C.C.P. art. 1842 (West 1990). "Thing adjudged" is defined in La.C.C. art. 3506(31) as "that which has been decided by a final judgment, from which there can be no appeal, either because the appeal did not lie, or because the time fixed by law for appealing is elapsed, or because it has been confirmed on the appeal" (emphasis added). Obviously, the trial court's judgment in Rey had not acquired the authority of a thing adjudged on June 10, 1992 because that judgment was then on appeal. Similarly, under the law of res judicata applicable in Segura, "a valid and final judgment is conclusive between the same parties, except on appeal or other direct review ...." La.R.S. 13:4231 (emphasis added). Because the trial court's judgment in Segura was on appeal on June 10, 1992, it was not conclusive between the parties at that time.
In light of the foregoing, we conclude a claim is pending as long as it is subject to judicial scrutiny. Even though a lower court has adjudicated a claim and rendered judgment, the claim continues to be pending until appeal of that judgment has been exhausted. Until then, something further remains to fix the plaintiff's right to enforce the claim as well as the defendant's obligation to pay it. In other words, a claim "pending appeal," as that phrase is commonly understood in a legal context, is a pending claim.
This interpretation of the term "pending" in Section 3 of Act 237 of 1992 is consistent with the previously cited general rule that an *728 appellate court is bound to adjudge a case before it in accordance with the law existing at the time of its decision. As we observed in Dripps, 366 So.2d at 548, some changes in the law "even apply to pending law suits." In that case, the court understood the term pending to mean "pending the appeal": "This Court has held that if judgment be correctly given under a law which is repealed pending the appeal, this Court is bound to reverse it." Id. at 547 (emphasis added) (citing State v. Johnson, 12 La. 547 (1838), and Cooper v. Hodge, 17 La. 476 (1841)). Considering this longstanding jurisprudential practice of applying certain changes in the law retroactively on appeal, we conclude the legislature, in enacting the retroactivity provision in Section 3, must have intended Act 237 of 1992 to apply to covered claims pending appeal as well as those pending adjudication in the trial court.
For these reasons, we hold both plaintiffs' "covered claims" were pending on June 10, 1992, the effective date of Act 237 of 1992, within the meaning of the retroactivity provision in Section 3. Act 237 of 1992 therefore applies to plaintiffs' claims unless retroactive application would violate the constitutional prohibitions against impairment of contractual obligations or disturbance of vested rights.

(b) Constitutionality of Retroactive Application
The Louisiana Legislature's power to enact retroactive laws is limited by the due process and contract clauses of the United States and Louisiana Constitutions. U.S. Const. amend. XIV, § 1; U.S. Const. art. I, § 10[1]; La. Const. art. I, § 2; La. Const. art. I, § 23. See St. Paul Fire & Marine Ins. Co. v. Smith, 609 So.2d 809, 816 n. 11 (La.1992); Board of Comm'rs v. Dept. of Natural Resources, 496 So.2d 281, 291 (La. 1986); Cahn v. Cahn, 468 So.2d 1176, 1181 (La.1985); Graham v. Sequoya Corp., 478 So.2d 1223, 1226 (La.1985); Terrebonne v. South Lafourche Tidal Control Levee Dist., 445 So.2d 1221, 1224 (La.1984); Block v. Reliance Ins. Co., 433 So.2d 1040, 1044 (La. 1983); Lott v. Haley, 370 So.2d 521, 523 (La.1979); Burmaster v. Gravity Drainage Dist. No. 2, 366 So.2d 1381, 1387 (La.1978). Previously we determined retroactive application of Act 130 of 1990, and hence of Act 237 of 1992,[35] would not disturb plaintiffs' vested rights in a cause of action against the party or parties legally liable for their injuries.[36] Therefore the only remaining issue of constitutional law is whether retroactive application of Act 237 of 1992 would unconstitutionally impair American's and Allstate's contractual obligations.
The Contract Clause, Article I, Section 10[1] of the United States Constitution, provides:
No state shall ... pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligations of Contracts....
Article I, Section 23 of the Louisiana Constitution of 1974 provides:
No bill of attainder, ex post facto law, or law impairing the obligation of contracts shall be enacted.
This court has described these constitutional provisions as "virtually identical" and "substantially equivalent." Board of Comm'rs, 496 So.2d at 291.[37] Although the language of each clause is facially absolute, its prohibition must be accommodated to the inherent police power of the state to safeguard the vital interests of its people. Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 410, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983); Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 434, 54 S.Ct. 231, 239, 78 L.Ed. 413 (1934); Board of Comm'rs, 496 So.2d at 292.
In Board of Commissioners, supra, this court detailed "the appropriate Contract *729 Clause standard" as enunciated by the Supreme Court in Energy Reserves, supra.[38] That standard requires a reviewing court to conduct the following four-step analysis: first, the court must determine whether the state law would, in fact, impair a contractual relationship; second, if an impairment is found, the court must determine whether the impairment is of constitutional dimension; third, if the state regulation constitutes a substantial impairment, the court must determine whether a significant and legitimate public purpose justifies the regulation; finally, if a significant and legitimate public purpose exists, the court must determine whether the adjustment of the rights and responsibilities of the contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption. Energy Reserves, 459 U.S. at 410-13, 103 S.Ct. at 704-05; Board of Comm'rs, 496 So.2d at 292-93.
Regarding the first inquiry, we have already determined application of Act 130 of 1990 in the present cases would retroactively increase American's and Allstate's contractual obligations under the UM policies issued to Segura and Rey.[39] This determination applies to Act 237 of 1992 as well. At the times American and Allstate issued the UM policies, La.R.S. 22:1386 and Hickerson, supra, limited the UM insurers' liability under those policies to claims in excess of a tortfeasor's liability insurance even in the event of the insolvency of the tortfeasor's insurer. If the 1992 amendment to La.R.S. 22:1386 is applied, under those same policies the UM insurers would be primarily liable for plaintiffs' claims against Dixie Lloyds. We now conclude this increase in American's and Allstate's obligations under the UM policies issued to Segura and Rey would, in fact, constitute an impairment of contractual relationships. Similarly, in Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), the Supreme Court found an impairment of a contractual relationship where a Minnesota law retroactively increased an employer's obligations under a private pension plan. The Court rejected "[t]he narrow view that the Clause forbids only state laws that diminish the duties of a contractual obligor and not laws that increase them...." Id., 438 U.S. at 244 n. 16, 98 S.Ct. at 2722 n. 16.
The next inquiry is "whether the impairment is of constitutional dimension." Board of Comm'rs, 496 So.2d at 292. This inquiry requires a reviewing court to determine the severity of the impairment. "The severity of the impairment measures the height of the hurdle the state legislation must clear." Allied Structural Steel, 438 U.S. at 254, 98 S.Ct. at 2727. Minimal alteration of contractual obligations may end the inquiry at its first stage, while severe impairment will push the inquiry to a careful examination of the nature and purpose of the state legislation. Id. Total destruction of contractual expectations is not necessary for a finding of substantial impairment. Energy Reserves, 459 U.S. at 411, 103 S.Ct. at 704; United States Trust Co. v. New Jersey, 431 U.S. 1, 26-27, 97 S.Ct. 1505, 1519-20, 52 L.Ed.2d 92 (1977); Board of Comm'rs, 496 So.2d at 292. On the other hand, state regulation that restricts a party to the gains it reasonably expected from the contract does not necessarily constitute a substantial impairment. Energy Reserves, 459 U.S. at 411, 103 S.Ct. at 704; United States Trust, 431 U.S. at 31, 97 S.Ct. at 1522 (citing El Paso v. Simmons, 379 U.S. 497, 515, 85 S.Ct. 577, 587, 13 L.Ed.2d 446 (1965)); Board of Comm'rs, 496 So.2d at 292.
In measuring the severity of an impairment of contractual obligations, a reviewing court first must consider
the factors that reflect the high value the Framers placed on the protection of private contracts. Contracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, *730 and the parties are entitled to rely on them.
Allied Structural Steel, 438 U.S. at 245, 98 S.Ct. at 2723. The court also must consider whether the industry the complaining party has entered has been regulated in the past. Energy Reserves, 459 U.S. at 411, 103 S.Ct. at 704; Allied Structural Steel, 438 U.S. at 242, 98 S.Ct. at 2721 (citing Veix v. Sixth Ward Bldg. & Loan Ass'n, 310 U.S. 32, 38, 60 S.Ct. 792, 794, 84 L.Ed. 1061 (1940) ("When he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic")); Board of Comm'rs, 496 So.2d at 292. See also Hudson Water Co. v. McCarter, 209 U.S. 349, 357, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908) (Holmes, J.) ("One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject matter"). Thus, where a complaining party enters a contractual relationship in a heavily regulated industry, expectations of further regulation of that industry may lessen the severity of a subsequent impairment of that party's contractual rights and obligations.
In the present cases, the severity of the impairments of American's and Allstate's contractual obligations under the UM policies can be measured first by determining the extent to which their contractual expectations would be frustrated by retroactive application of La.R.S. 22:1386 as amended by Act 237 of 1992. At the times American and Allstate issued the UM policies to Segura and Rey, this court's interpretation of La. R.S. 22:1386 in Hickerson, supra, was the settled law of Louisiana. "It is a fundamental principle that laws existing at the time a contract is entered into are incorporated into and form a part of the contract as though expressly written therein." Board of Comm'rs, 496 So.2d at 294; see Dantoni v. Board of Levee Comm'rs of the Orleans Levee Dist., 227 La. 575, 80 So.2d 81, 83 (1955); Johnson v. Anderson-Dunham Concrete Co., 212 La. 276, 31 So.2d 797 (1947); Forgay v. Ferguson, 6 La.Ann. 770 (1851). Accordingly, consistent with La.R.S. 22:1386 as interpreted in Hickerson, neither American nor Allstate obligated itself to provide its insured with coverage against the risk of insolvency of a tortfeasor's liability insurer. Each reasonably expected LIGA to cover claims against insolvent insurers even where UM coverage is otherwise available to a claimant. Thus, retroactive application of La.R.S. 22:1386 as amended by Act 237 of 1992 would frustrate the UM insurers' contractual expectations by requiring them to assume liability for their insureds' claims against Dixie Lloyds. To that extent, the impairments of American's and Allstate's contractual obligations under the UM policies would be substantial.
On the other hand, American and Allstate issued the UM policies to Rey and Segura against a background of pervasive state regulation of UM insurance. In Louisiana, UM coverage embodies a strong public policy and is determined not only by contractual provisions, but also by applicable statutes. Roger v. Estate of Moulton, 513 So.2d 1126, 1130 (La.1987); A.I.U. Ins. Co. v. Roberts, 404 So.2d 948, 949-51 (La.1981); Breaux v. Government Emp. Ins. Co., 369 So.2d 1335, 1338 (La.1979); Seaton v. Kelly, 339 So.2d 731, 733-34 (La.1976). See also Fireside Mutual Life Ins. Co. v. Martin, 223 La. 583, 593, 66 So.2d 511, 514 (1953) ("The nature of the insurance business is impressed with the public interest, and, therefore the Legislature in large measure fixes the public policy"). The UM statute, La.R.S. 22:1406(D),[40] *731 is incorporated into every policy of insurance to which it is applicable, as if it were written in the policy itself. Block v. Reliance, 433 So.2d 1040, 1044 (La.1983). Moreover, "[n]ot only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order." Board of Comm'rs, 496 So.2d at 293. Consequently, every UM policy incorporates the state's reserved power to regulate UM insurance.
Confronted with the state's broad power to regulate UM insurance and its pervasive exercise of that power, American and Allstate had reason to anticipate their obligations under the UM policies issued to Segura and Rey might be altered by further legislation. These cases therefore are distinguishable from Allied Structural Steel, supra, where the state law "did not operate in an area already subject to state regulation at the time the company's contractual obligations were originally undertaken, but invaded an area never before subject to regulation by the State" and imposed "a completely unexpected liability in potentially disabling amounts." Id., 438 U.S. at 247-50, 98 S.Ct. at 2724-25. In that case, the Court found severe impairment of the company's contractual obligations.[41] In the present cases, while we find retroactive application of La. R.S. 22:1386 as amended by Act 237 of 1992 would substantially impair American's and Allstate's contractual obligations under the UM policies, we also find that because the state has traditionally regulated UM insurance as a matter of public policy, at the time of contracting the UM insurers should have expected further legislation on the same topic. These expectations significantly lessen the severity of the impairments of the UM insurers' contractual obligations.
On balance, we conclude the impairments in these cases constitute more than minimal alteration of the UM insurers' contractual obligations and therefore are of constitutional dimension. We further conclude, however, the impairments constitute considerably less than total destruction of the UM insurers' contractual expectations. Accordingly, as we inquire into the public purpose justifying retroactive application of Act 237 of 1992, we emphasize the legislative judgment is entitled to considerable deference.
The determination of whether a significant and legitimate public purpose justifies the regulation is the third inquiry under the appropriate Contract Clause standard. As we noted in Board of Commissioners, 496 So.2d at 295, the Supreme Court has recognized that a state may legitimately protect a virtually limitless range of interests that conflict with or affect economic rights. See, e.g., East N.Y. Sav. Bank v. Hahn, 326 U.S. 230, 66 S.Ct. 69, 90 L.Ed. 34 (1945); Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934); Marcus Brown Holding Co. v. Feldman, 256 U.S. 170, 41 S.Ct. 465, 65 L.Ed. 877 (1921). The public purpose requirement is primarily designed to prevent a state from embarking on a policy motivated by a simple desire to escape its financial obligations or to injure others through the repudiation of debts or the destruction of contracts or the denial of means to enforce them. Blaisdell, 290 U.S. at 398, 54 S.Ct. at 231; United States Trust, 431 U.S. at 52, 97 S.Ct. at 1533 (1977) (Brennan, J., dissenting); Board of Comm'rs, 496 So.2d at 295. Because there are few limits on the legitimacy of public purposes, inquiry into whether the state has adopted truly public ends typically is perfunctory. Board of Comm'rs, 496 So.2d at 295.
In the present cases, we must determine whether a significant and legitimate public purpose justifies retroactive application of Act 237 of 1992. The Act itself may reasonably be viewed as a measure designed to ensure the continued availability of the protection LIGA affords claimants and policy-holders *732 who otherwise would suffer financial losses because of the insolvency of an insurer. By requiring claimants and policyholders to exhaust any available UM coverage before proceeding against LIGA, the Act serves to minimize the unnecessary depletion of LIGA's funds while at the same time furthering the LIGA Law's stated purpose of avoiding "financial loss to claimants or policyholders because of the insolvency of an insurer." La.R.S. 22:1376. Similarly, the legislature's decision to give Act 237 of 1992 retroactive effect may reasonably be viewed as a measure designed to immediately minimize unnecessary depletion of LIGA's funds. Clearly, retroactive application of Act 237 of 1992 would constitute a legitimate exercise of the state's police power for the purpose of protecting the state's citizens from economic harm.[42] For this reason we conclude a significant and legitimate public purpose justifies retroactive application of Act 237 of 1992.
The fourth and final inquiry is whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption. Energy Reserves, 459 U.S. at 412, 103 S.Ct. at 705; United States Trust, 431 U.S. at 22, 97 S.Ct. at 1517; Board of Comm'rs, 496 So.2d at 293. Unless the state itself is a contracting party, as is customary in reviewing economic and social regulation, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure. Id. However, even when the law addresses a legitimate end, it may not be used to burden a politically defenseless or easy target group with the imposition of costs without fair attention to its interests. Board of Comm'rs, 496 So.2d at 293; cf. United States v. Carolene Prod. Co., 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938).
The contractual relationships impaired in these cases are private ones between Allstate and American as UM insurers on the one hand, and Rey and Segura as insureds on the other. Accordingly, as we examine the necessity and reasonableness of applying Act 237 of 1992 retroactively, the legislature's judgment is entitled to proper deference. In this context, we find that in choosing retroactive application of Act 237 of 1992 as a means of immediately minimizing unnecessary depletion of LIGA's funds, the legislature simply shifted the risk of insurer insolvencies from LIGA onto UM insurers which, but for LIGA, would have borne the risk anyway. This is because absent LIGA's coverage of Rey's and Segura's claims against Dixie Lloyds, Dixie Lloyds would be unable to make payment on the claims because of insolvency; hence, as provided in La.R.S. 22:1406(D)(2)(a),[43] each tortfeasor's motor vehicle would be deemed an "uninsured motor vehicle" within the meaning of the American and Allstate UM policies.[44] By making Act 237 of 1992 retroactive to pending claims, the legislature merely excludes from LIGA's coverage those pending claims otherwise covered by UM insurance.
The only potential obstacle to our finding retroactive application of Act 237 of 1992 reasonable and appropriate involves the concern initially expressed in Hickerson that a tortfeasor who is also a policyholder of an insolvent insurer might be left unprotected from subrogation claims asserted by a claimant's UM insurer.[45] As we observed in Hickerson, 383 So.2d at 379, such a result would *733 frustrate the LIGA Law's stated purpose of avoiding "financial loss to claimants or policyholders because of the insolvency of an insurer." La.R.S. 22:1376 (emphasis added). By ultimately shifting the risk of insurer insolvency to unprotected policyholders of those insurers, retroactive application of Act 237 of 1992 would be unreasonable and inappropriate to achieve the legitimate end of minimizing unnecessary depletion of LIGA's funds.
In the present cases, we note the legislature addressed this concern in Act 105 of 1990 by amending the definition of a "covered claim" in La.R.S. 22:1379(3) to immunize policyholders of insolvent insurers against subrogation claims asserted by claimants' UM insurers.[46] We also note Section 3 of Act 237 of 1992 provides: "This Act shall apply to all covered claims, as defined in R.S. 22:1379, pending on or arising on or after the effective date of this Act" (emphasis added). Thus, we find the legislature, by specifically citing in Act 237 of 1992 the definition of "covered claim" as amended two years earlier by Act 105 of 1990, expressed its intent to give the amended definition of "covered claim" retroactive application to pending claims. Furthermore, as a measure designed to protect policyholders of insolvent insurers, Act 105 of 1990 is a necessary concomitant of retroactive application of La. R.S. 22:1386 as amended by Act 237 of 1992 and imposes no financial burdens on UM insurers other than those heretofore contemplated in this opinion. Therefore, finding no further question arises as to the constitutionality of applying Act 105 of 1990 retroactively, we hold it applies retroactively in these cases and removes the only remaining impediment to retroactive application of Act 237 of 1992.
In sum, although retroactive application of La.R.S. 22:1386 as amended by Act 237 of 1992 would impair American's and Allstate's contractual obligations under the UM policies by making them primarily liable for Segura's and Rey's claims against Dixie Lloyds, the adjustment of the UM insurers' rights and responsibilities is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption. Accordingly, under the appropriate Contract Clause standard, we conclude retroactive application of Act 237 of 1992 would violate neither the federal nor the state constitutional prohibitions against impairment of contractual obligations.

CONCLUSION
For the foregoing reasons, we hold La.R.S. 22:1386 as amended by Act 237 of 1992 applies to the plaintiff's claim in each of these consolidated cases. Although we disagree in part with the reasoning of the Louisiana Fifth Circuit Court of Appeal in Rey v. Guidry et al., No. 93-C-1401, we affirm the judgment of that court. We reverse the judgment of the Louisiana Third Circuit Court of Appeal in Segura v. Frank et al., No. 93-C-1271, and remand that case to the court of appeal for further proceedings consistent with this opinion.
NOTES
[*] Pursuant to Rule IV, Part 2, § 3 of the Rules of the Supreme Court of Louisiana, Marcus, J., was not on the panel which heard and decided this case. See the footnote in State v. Barras, 615 So.2d 285, 286 n. 1 (La.1993).
[1] See infra text accompanying notes 10-15.
[2] See infra note 15 and accompanying text.
[3] 615 So.2d 516 (La.App. 3d Cir.1993).
[4] The fourth circuit also had concluded Act 130 of 1990 was substantive and applied prospectively only in Dangerfield v. Soto, 599 So.2d 1092 (La.App. 4th Cir.1991), a case involving nearly identical facts.
[5] See Cole v. Celotex Corp., 599 So.2d 1058, 1063 and n. 15 (La.1992) ("Once a party's cause of action accrues, it becomes a vested property right that may not constitutionally be divested," and "Under Louisiana law, a cause of action accrues when the party has the right to sue"); Terrebonne v. South Lafourche Tidal Control Levee Dist., 445 So.2d 1221, 1224 (La.1984) ("The Legislature simply cannot take away an existing cause of action based upon substantive rights which had clearly been granted by legislation during the preceding session and had become vested on the effective date of the legislation"); Burmaster v. Gravity Drainage Dist. No. 2, 366 So.2d 1381, 1387 (La.1978) ("Where an injury has occurred for which the injured party has a cause of action, such cause of action is a vested property right which is protected by the guarantee of due process"); Lott v. Haley, 370 So.2d 521, 524 (La.1979) (same).
[6] 618 So.2d 425 (La.App. 5th Cir.1993).
[7] In a concurrence to the Rey opinion, Judge Bowes noted the first circuit previously had held the date of Dixie Lloyds' insolvency governed the law to be applied in a case involving nearly identical facts. See Hebert v. Liner, 620 So.2d 294 (La.App. 1st Cir.1993); see infra text accompanying notes 18-19.
[8] Although the trial court had granted a partial summary judgment in favor of Allstate on May 20, 1992, prior to the June 10, 1992 effective date of the Act, the court of appeal found the adjudication vis-a-vis Allstate was not final until October 5, 1992, the date the trial court ruled in favor of Rey and against LIGA. "At the time the trial court ruled," stated the court, "it should have considered the retroactive application of R.S. 22:1386."
[9] 620 So.2d 822 (La.1993).
[10] La.R.S. 22:1375-1394.
[11] See La.R.S. 22:1376, supra.
[12] See Bond v. Commercial Union Assur. Co., 407 So.2d 401, 408 (La.1981) (on rehearing) ("We conclude that upon payment an insurer, pursuant to a subrogation agreement contained in its policy, becomes conventionally subrogated to its insured's right against the uninsured tortfeasor").
[13] See La.R.S. 22:1382(1), supra.
[14] La.Rev.Stat. 22:1406(D) is the UM statute. La.R.S. 22:1406(D)(2)(a) provides:

For the purpose of this coverage, the terms "uninsured motor vehicle" shall, subject to the terms and conditions of such coverage, be deemed to include an insured motor vehicle where the liability insurer thereof is unable to make payment with respect to the legal liability of its insured within the limits specified therein because of insolvency.
[15] Section 2 of Act 237 of 1992 amended La.R.S. 22:1386 by adding subsection (C), relating to recovery by nonresidents, and subsection (D), relating to LIGA's duty to defend as to certain issues arising out of the coverage under La.R.S. 22:1386. Section 2 also repealed the "dollar-for-dollar credit" added to La.R.S. 22:1386(1) in Act 130 of 1990 and substituted the following sentence in La.R.S. 22:1386(A): "As to the association, any amount payable by such other insurance shall act as a credit against the damages of the claimant, and the association shall not be liable for such portion of the damages of the claimant."
[16] See also La.R.S. 1:2, which provides: "No Section of the Revised Statutes is retroactive unless it is expressly so stated." According to this court's consistent interpretation, the general rule of prospective application applies only to substantive laws as distinguished from merely procedural or remedial laws, which will be given retroactive effect in the absence of language showing a contrary intention. See St. Paul Fire & Marine Ins. Co. v. Smith, 609 So.2d 809, 816 (La.1992); Lott v. Haley, 370 So.2d 521, 523 (La.1979); Ardoin v. Hartford Acc. & Indem. Co., 360 So.2d 1331 (La.1978); General Motors Acceptance Corp. v. Anzelmo, 222 La. 1019, 64 So.2d 417 (1953).
[17] U.S. Const. amend. XIV, § 1; U.S. Const. art. I, § 10[1]; La. Const. art. I, § 2; La. Const. art. I, § 23.
[18] For this court's pronouncements concerning when a "vested right" exists in this context, see supra note 5.
[19] LIGA also cites Cooper v. Huddy, 581 So.2d 723 (La.App. 1st Cir.), writ denied, 585 So.2d 552 (1991), and Prejean v. Dixie Lloyds Ins. Co., 602 So.2d 764 (La.App. 3d Cir.1992). In Cooper, the court of appeal held LIGA liable up to the $150,000.00 statutory cap in effect on the date of the insurer's insolvency rather than the $50,000.00 statutory cap in effect on the date of the accident. In Cooper, however, the statutory cap did not implicate any party's rights and obligations which arose prior to the declaration of the insurer's insolvency. In contrast, La.R.S. 22:1386 purports to affect not only rights and obligations which arise upon an insurer's insolvency but also claimants' and UM insurers' rights and obligations under previously existing UM policies.

Similarly, in Prejean, the court of appeal applied the law in effect on the date of the insurer's liquidation to limit LIGA's exposure to court costs resulting from an accident which occurred prior to the effective date of the law. Again, the statute at issue, in Prejean did not affect any party's pre-insolvency rights or obligations because LIGA's obligation to pay court costs did not arise until the insurer was declared insolvent. A UM insurer's rights and obligations under a UM policy, on the other hand, arise at the time the policy is issued, which occurred prior to Dixie Lloyds' insolvency in each of the present cases. Thus, we find both Cooper and Prejean distinguishable from these cases.
[20] We note neither the third circuit in Segura nor the fourth circuit in Dangerfield, supra, considered the 1990 amendment's effect on the UM insurers' rights and obligations, although both courts concluded the amendment would retroactively disturb the plaintiffs' vested rights against LIGA as Dixie Lloyds' successor. See supra note 4 and accompanying text.
[21] In Block, UM policies had been issued to plaintiffs prior to an amendment to La.R.S. 22:1406(D) allowing insurers to prohibit "stacking" of UM coverage, though in both consolidated cases the accidents had occurred after the amendment's effective date. The UM insurers argued that the law in effect on the dates of the accidents gave effect to provisions in the policies which purported to bar stacking. We rejected that argument with the following reasoning:

The obligations assumed by the insurers in both cases were assumed against a backdrop of R.S. 22:1406(D) before the anti-stacking amendment was passed. At the time the policies were issued the insurers knew that they were subjected to the risk of stacking of multiple UM coverages, in spite of the policy provisions.
Id. (emphasis added).
Under Block, therefore, the relevant time for determining whether a change in the law retroactively affects an insurer's or insured's rights and obligations is when the policy is issued.
[22] See supra note 5.
[23] Actually, plaintiffs would have greater rights against the UM insurers than they would against LIGA. A "covered claim" against LIGA, for example, "shall not include any claim based on or arising from a pre-insolvency obligation of an insolvent insurer, including but not limited to contractual attorneys' fees and expenses, statutory penalties and attorneys' fees, court costs, interest and bond premiums, or any other expenses incurred prior to the determination of insolvency." La.R.S. 22:1379(3)(d). Additionally, LIGA's obligation to a claimant is subject to a $100.00 deductible and a maximum limit of $150,000.00 per claim and $300,000.00 per accident or occurrence. La.R.S. 22:1382(A)(1)(a). Because retroactive application of La.R.S. 22:1386 as amended by Act 130 of 1990 or as amended by Act 237 of 1992 would have the effect of removing the foregoing limitations from plaintiffs' claims by permitting them to exhaust their UM coverages before proceeding against LIGA, we need not decide whether legislation imposing such limitations on pre-existing claims would be substantive or would unconstitutionally disturb a claimant's vested rights.
[24] See supra note 20 and accompanying text.
[25] Cf. McMahon v. LIGA, 596 So.2d 1384, 1391 (La.App. 1st Cir.1992) (finding the 1990 amendment to La.R.S. 22:1386 substantive to the extent it overruled Hickerson).
[26] See also St. Paul Fire & Marine, 609 So.2d at 817; Ardoin, 360 So.2d at 1338-39.
[27] See 1990 La. Acts No. 105, supra.
[28] Despite this reasoning, the court of appeal went on to find that "in any event ... the claim in this matter is not a `pending claim' within the purview of Section 3 of Act 237 of 1992."
[29] See supra note 15 and accompanying text.
[30] See supra text accompanying note 27.
[31] See supra note 17 and accompanying text.
[32] As recalled, the court of appeal previously had remarked that the applicability of Act 237 of 1992 should not be argued for the first time on appeal, a suggestion we have already rejected. See supra note 28 and accompanying text.
[33] La.C.C. art. 3463 provides:

An interruption of prescription resulting from the filing of a suit in a competent court and in the proper venue or from service of process within the prescriptive period continues as long as the suit is pending. Interruption is considered never to have occurred if the plaintiff abandons, voluntarily dismisses, or fails to prosecute the suit at the trial.
(Emphasis added.)
[34] The Louisiana Legislature effected a substantial change in the law of res judicata in Act 521 of 1990. See La.R.S. 13:4231, comment (a). Section 1 of the Act enacted the new res judicata statutes, La.R.S. 13:4231-4232, while Section 3 of the Act repealed the old law of res judicata embodied in La.C.C.P. art. 1842. Section 5 of Act 521 of 1990 provides:

This Act shall become effective January 1, 1991, and shall apply to all civil actions filed on or after January 1, 1991. The preclusive effect and authority of a judgment rendered in an action filed before the effective date of this Act shall be determined by the law in effect prior to January 1, 1991.
In the present cases, Rey filed suit on July 30, 1990, and Segura filed suit on March 4, 1991. Thus, La.C.C.P. art. 1842 applies to determine the preclusive effect and authority of the judgment rendered by the trial court in Rey, whereas La.R.S. 13:4231 applies to determine the preclusive effect and authority of the judgment rendered by the trial court in Segura.
[35] See supra text accompanying note 29.
[36] See supra text accompanying note 22.
[37] In Board of Comm'rs, 496 So.2d at 291, we noted:

Article I, Sec. 23 of the 1974 Louisiana Constitution was adopted without debate following a brief explanation indicating that its provisions were intended to incorporate the substance of the contract clauses of the United States Constitution and the 1921 Louisiana Constitution. XV Records September 13, 1973, at 3-4.
[38] See also Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978); United States Trust Co. v. New Jersey, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977); Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934).
[39] See supra notes 20-21 and accompanying text.
[40] La.R.S. 22:1406(D) provides in pertinent part:

(1)(a)(i) No automobile liability insurance covering liability arising out of the ownership, maintenance, or use of any motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle designed for use on public highways and required to be registered in this state or as provided in this Subsection unless coverage is provided therein or supplemental thereto, in not less than the limits of bodily injury liability provided by the policy, under provisions filed with and approved by the commissioner of insurance, for the protection of persons insured thereunder who are legally entitled to recover nonpunitive damages from owners or operators of uninsured or underinsured motor vehicles because of bodily injury, sickness, or disease, including death resulting therefrom; however, the coverage required under this Subsection shall not be applicable where any insured named in the policy shall reject in writing, as provided herein, the coverage or selects lower limits.
[41] Cf. Energy Reserves, 459 U.S. at 416, 103 S.Ct. at 707 ("ERG knew its contractual rights were subject to alteration by state price regulation. Price regulation existed and was foreseeable as the type of law that would alter contract obligations.... In short, ERG's reasonable expectations have not been impaired by the Kansas Act").
[42] See Fireside Mutual Life Ins. Co. v. Martin, 223 La. 583, 590-92, 66 So.2d 511, 513-14 (1953) (finding an amendment to the Louisiana Insurance Code an exercise of the state's police power); see also La. Const. art. 6, § 9(B) ("[T]he police power of the state shall never be abridged").
[43] La.R.S. 22:1406(D)(2)(a) provides:

For the purpose of this coverage, the terms "uninsured motor vehicle" shall, subject to the terms and conditions of such coverage, be deemed to include an insured motor vehicle where the liability insurer thereof is unable to make payment with respect to the legal liability of its insured within the limits specified therein because of insolvency.
[44] The Hickerson court's decision to interpret the LIGA Law "to deem LIGA the insurer with all the obligations of the insolvent insurer" had removed motor vehicles insured by insolvent insurers from the scope of UM coverage. Hickerson, 383 So.2d at 379. See supra text accompanying note 14.
[45] See supra notes 11-12 and accompanying text.
[46] La.R.S. 22:1379(3) as amended by Act 105 of 1990 provides in pertinent part:

(b) "Covered claim" shall not include any amount due any reinsurer, insurer, insurance pool, or underwriting association, as subrogation recoveries or otherwise. In addition, the insured of an insolvent insurer shall likewise not be liable for any subrogation claim asserted by any reinsurer, insurer, insurance pool, or underwriting association to the extent of the applicable liability limits previously provided to such insured by the insolvent insurer.
(Emphasis added.)