851 So.2d 1100 (2003)
Gregg SMITH, et al.
v.
BOARD OF TRUSTEES OF LOUISIANA STATE EMPLOYEES' RETIREMENT SYSTEM.
No. 2002-CA-2161.
Supreme Court of Louisiana.
June 27, 2003.
Rehearing Denied September 5, 2003.
*1101 Kevin P. Torres, Baton Rouge, Counsel for Applicant.
Celia R. Cangelosi, Sheri M. Morris, Baton Rouge, Counsel for Respondent.
VICTORY, Justice.
This appeal concerns the constitutionality of La. R.S. 11:416.1, which pertains to reemployment packages available to certain retired state employees. After reviewing the record and the applicable law, we reverse the judgment of the trial court and find the statute to be constitutional.

FACTS AND PROCEDURAL HISTORY
Prior to June 30, 2001, La. R.S. 11:416 offered retirees of the Louisiana State Employees Retirement System ("LASERS") the choice of three options regarding their benefits if they chose to return to state employment. Under Option 1, a reemployed retiree could continue to receive his pension benefits until he earned more than fifty percent of his annual allowance during any fiscal year. After that point, a reemployed retiree's benefits were reduced by the amount earned in excess of fifty percent. A retiree who chose Option 1 could not become a contributing member of LASERS. La. R.S. 11:416(A)(1) (1995). Option 2 allowed a reemployed retiree to regain membership in LASERS by repaying any benefits received from the system, plus interest thereon. In addition, Option 2 required a retiree to pay into the system an amount equal to the employee and employer contributions which would have *1102 been paid had he become a member at the commencement of the resumption of covered employment. Upon such regaining of membership, Option 2 treated the reemployed retiree as if he had never retired by restoring all service credit standing at the time of his retirement and thereafter permitting the accumulation of additional service credit for work performed following reemployment. La. R.S. 11:416(A)(2) (1995). Finally, Option 3 allowed a retiree to request immediate suspension of his benefits and become a member of the system effective on the first day of reemployment. Upon subsequent retirement, Option 3 fully restored the reemployed retiree's suspended allowances. In addition, Option 3 provided a supplemental benefit attributable to the retiree's service and average compensation since reemployment on the condition he had worked for at least thirty-six months. La. R.S. 11:416(A)(3) (1995).
Act 455 of the Regular Legislative Session, effective June 30, 2001, amended La. R.S. 11:416. Act. 455 eliminated the three options and allowed a reemployed retiree to receive both his salary and full retirement benefits provided he had been retired for a period of at least twelve months (known as "the waiting period") before he returned to work. If a retiree returned to work before the expiration of the twelve month "waiting period," his benefits would be suspended for twelve months. Act 455 also restored membership in LASERS by requiring the reemployed retiree's employer to remit both employer and employee contributions to LASERS based on the rate that applied to the retiree's position on the date of his reemployment. Additionally, if the retiree had worked and contributed to the system for a least thirty-six months following reemployment, Act 455 permitted his retirement allowance to be supplemented by an amount attributable to the service that occurred during reemployment and the average compensation calculated for the period of such reemployment. Thus, in total, Act 455's amendment to La. R.S. 11:416 allowed a reemployed retiree to (1) receive his salary plus his full retirement benefits after the twelve month waiting period; (2) regain membership in LASERS, and (3) earn a supplemental benefit if reemployed for over thirty-six months. La. R.S. 11:416, as enacted by 2001 La. Acts, Reg. Sess., No. 455.[1]
*1103 Effective May 9, 2002, the legislature, by Act 165 of the 2002 First Extraordinary Session, repealed Act 455's benefit provisions and returned the law that existed prior to Act 455's enactment. Consequently, La. R.S. 11:416 once again required a retiree who returned to state employment to select one of the three options regarding his benefits.[2] In repealing *1104 Act 455, however, the legislature enacted La. R.S. 11:416.1 which applied specifically to the retirees who had retired and been rehired during the 10 month interim period under Act 455. Instead of receiving the reemployment benefits under Act 455, those retirees were now required by La. R.S. 11:416.1 to select one of four irrevocable options:
§ 416.1. Reemployment of retirees under Act No. 455 of the 2001 Regular Session
A retiree who retired under the provisions of Act No. 455 of the 2001 Regular Session and was rehired prior to the effective date of this Section in employment which otherwise would render him eligible for membership in the system shall choose one of the following irrevocable options:
(1) Option 1 as provided in R.S. 11:416(A).
(2) Option 2 as provided in R.S. 11:416(A).
(3) Option 3 as provided in R.S. 11:416(A).
(4) Option 4. At the request of the retiree his retirement benefits shall be suspended for twelve months following the effective date of his retirement or until his reemployment ends, whichever occurs first. The retiree shall receive his retirement benefits after such suspension, but he shall accrue no additional service credit during reemployment. Under this option, neither the retiree nor the employer shall make any contribution to the system.
Acts 2002, 1st Ex.Sess., No. 165, § 2 further provided as follows:
R.S. 11:416.1 as enacted by Section 1 of this Act shall be applicable to any person who retired on or after June 30, 2001. Within thirty days after the effective date of this Act, any person who *1105 retired under the provisions of Act No. 455 of the 2001 Regular Session of the Legislature and was rehired before the effective date of this Act shall choose one of the Options provided in Section 1 of this Act. Should any such person fail to make a choice within the thirty-day period, the retiree shall be considered as returning to active service under Option 3 as provided in Section 1 of this Act. However, this Act shall have no effect upon any person who retired prior to the effective date of Act No. 455 of the 2001 Regular Session of the Legislature who is reemployed and receiving retirement benefits when this Act becomes effective and such person shall continue to receive such retirement benefits.
The plaintiffs in this case are 161 state employees of the Department of Corrections who retired after June 30, 2001 and had been rehired before May 9, 2002. In fact, the record reflects that after considering the reemployment benefits offered by Act 455, certain of these plaintiffs actually retired on a Friday and were rehired the following Monday. The plaintiffs filed suit against the Board of Trustees of LASERS, seeking a declaratory judgment that La. R.S. 11:416.1, as enacted by Act 165, was unconstitutional. On May 28, 2002, the trial court issued a temporary restraining order enjoining LASERS from implementing La. R.S. 11:416.1 as to the plaintiffs. The temporary restraining order was amended on May 29, 2002, to suspend the requirement of Act 165 to make an option selection pending further orders of the court.
Trial was held on June 12, 2002, on the preliminary and permanent injunctions, as well as the request for declaratory relief. Plaintiffs argued that La. R.S. 11:416.1, by retroactively depriving them of the benefits offered under Act 455, violated both the Contract Clauses of the United States and Louisiana Constitutions, as well as La. Const. Art. X, § 29, which affords special protection to the pensions of state officers and employees. Defendants argued that none of the plaintiffs had a "vested" right in any of the reemployment benefits provided by Act 455 and thus, the enactment of La. R.S. 11:416.1 was a permissible exercise of the legislature's plenary powers. On June 26, 2002, in its oral reasons for judgment, the trial court found that La. R.S. 11:416.1 as enacted by Act 165 was violative of Article I, § 10 of the United States Constitution and Article I, § 23 of the Louisiana Constitution and Article X, § 29 of the Louisiana Constitution, as well as the Fourteenth Amendment. Defendant devolutively appealed the trial court's decision to this Court pursuant to Article V, § 5(D)(1) of the Louisiana Constitution of 1974 which grants this Court appellate jurisdiction over all cases in which "a law or ordinance has been declared unconstitutional."

DISCUSSION
Acts 2002, No. 165, which enacted La. R.S. 11:416.1 effective May 9, 2002, expressly declared that the provisions of La. R.S. 11:416.1 would apply to "any person who retired on or after June 30, 2001." Thus, pursuant to La. C.C. Art. 6, which provides that "in the absence of contrary legislative expression, substantive laws apply prospectively only," La. R.S. 11:416.1 has retrospective application. Segura v. Frank, 630 So.2d 714, 721 (La. 1994). However, "this Court has observed that the principle contained in La. C.C. art. 6 has constitutional implications under the due process and contract clauses of both the United States and Louisiana Constitutions." Id. (Cites omitted.) "Thus, even where the legislature has expressed its intent to give a substantive law retroactive effect, the law may not be applied retroactively if it would impair contractual obligations or disturb vested rights." Id. As *1106 this Court has explained, a law does not operate retroactively unless it (1) evaluates the conditions of the legality of a past act, or (2) modifies or suppresses the effects of a right already acquired. Walls v. American Optical Corp., 98-0455 (La.9/8/99), 740 So.2d 1262.
Plaintiffs argue that in this case, the protection against retroactively applying laws to state employees regarding their retirement benefits is even stronger than the "vested rights" protections above, as La. Const. Art. X, § 29(E)(5), added pursuant to Act 947 of the 1987 Regular Session, specifically provides:
The accrued benefits of members of any state or statewide public retirement system shall not be diminished or impaired. Future benefit provisions of the state and statewide public retirement systems shall only be altered by legislative enactment. (Emphasis added.)
In this case, plaintiffs point out that the only persons eligible to receive the benefits under Act 455 were employees who had accumulated enough service time to retire under LASERS. Plaintiffs therefore claim that their right to the benefits under Act 455 had "accrued" by virtue of their years of service prior to their initial retirement. As a result, once they had retired and were reemployed, they became entitled to receive full salary, retirement benefits after the twelve-month suspension, continued membership in the system, and a supplemental retirement after reemployment for more than thirty-six months. However, plaintiffs argue that none of the four options under La. R.S. 11:416.1 permit plaintiffs to receive all of these benefits. For instance, under Option 3, plaintiffs cannot receive their retirement benefits after the twelve-month waiting period. Under Option 4, plaintiffs cannot earn a supplemental benefit if reemployed for more than thirty-six months. Thus, plaintiffs argue that La. R.S. 11:416.1 requires them to select an option which would result in diminishing or impairing their accrued benefits in direct violation of Article X, Section 29(E)(5).
Defendant argues that neither Article X, § 29(E)(5), nor the prohibition against disturbing "vested rights," is violated in this case because plaintiffs' rights to the reemployment benefits offered in Act 455 had neither "vested" nor "accrued." Their rights to receive their retirement benefits along with their salaries during their period of reemployment neither "vested" nor "accrued" until they had been reemployed for twelve months. Similarly, their rights to receive an additional supplemental benefit along with their salaries and retirement benefits did not "vest" nor "accrue" until they had been reemployed for thirty-six months. Thus, defendant argues, because the law was changed prior to the time plaintiffs fulfilled the twelve-month waiting period or were reemployed for thirty-six months, the law does not operate retroactively, nor does it diminish or impair accrued rights.
We agree. Under this Court's interpretation, a "vested" right "must be absolute, complete and unconditional, independent of a contingency, and a mere expectancy of future benefit ... does not constitute a vested right." Sawicki v. K/S Stavanger Prince, 01-0528 (La. 12/7/01), 802 So.2d 598. Similarly, "accrued" has been defined to mean "in the sense of due and payable; vested," Black's Law Dictionary, and "to day on which the creditor could institute his demand." Ledoux v. City of Baton Rouge, 99-2061 (La.2/29/00), 755 So.2d 877, 879-80. Further, La. R.S. 11:403(33) specifically defines a "vested right" in the context of LASERS as "when a member obtains retirement eligibility as to age and service in accordance the provisions *1107 of this Chapter." "Retirement" is defined to mean "termination of active service, with a retirement allowance granted under the provisions of this Chapter." La. R.S. 11:403(23). "Termination" is defined to mean "complete cessation of employment with the state." La. R.S. 11:403(31). There is no doubt that the plaintiffs had a "vested" or "accrued" right in retirement benefits under LASERS as they had obtained retirement eligibility as to age and service, and, in fact, terminated their employment with the state. Had they not decided to become reemployed, they would have been entitled to their retirement benefit, and, in this case, they selected a mode of payment of these benefits under La. R.S. 11:446.[3] Indeed, defendant concedes that plaintiffs' right to their general retirement benefits "vested" or "accrued" upon their retirement.
However, the benefits offered by La. R.S. 11:416 are not retirement benefits, but reemployment benefits. Although these reemployment benefits include the right to certain retirement benefits along with a salary after reemployment for a certain period of time, they do not begin to accrue until a retiree becomes reemployed. Plaintiffs' rights to their retirement benefits under LASERS is not contested, it is their right to be reemployed and receive both their salary and their retirement benefits after 12 months of reemployment, and then their salary, retirement benefits, and supplemental benefits after 36 months of reemployment that is at issue. These plaintiffs simply had not fulfilled the necessary conditions of reemployment in order to be entitled to receive their salary along with their retirement benefits because they had not been reemployed for 12 months prior to the law being changed; similarly they had not been reemployed for 36 months which was a necessary condition to being able to also receive a supplemental benefit.[4]
As in the area of retirement benefits, where courts have consistently held that a public employee's right to retirement benefits does not "vest" until eligibility for retirement is attained, reemployment benefits for retirees likewise do not vest until eligibility as to age and service is attained. Prior to the achievement of eligibility, courts have deemed the right to be inchoate and the details of a contributory retirement system, such as rate of contribution, benefits, length of service, and age requirements could be modified to the prejudice of the employee. Patterson v. City of Baton Rouge, 309 So.2d 306 (La. 1975); Faulk v. State, 382 So.2d 992 (La. App. 1 Cir.1980); State, ex rel. Murray v. Board of Trustees of Police Pension Fund for City of New Orleans, 259 So.2d 613 (La.App. 4 Cir.1972); Adolph v. Sewerage & Water Board Pension Committee, 202 *1108 So.2d 664 (La.App. 4 Cir.1967); Young v. Department of Highways, 160 So.2d 391 (La.App. 1 Cir.1964); Bowen v. Board of Trustees of Police Pension Fund, 76 So.2d 430 (La.App.Orl. 1954). In particular, it has been held that the legislature can "validly enact laws to change the inchoate retirement rights of employees to (1) increase the required length of service from sixteen years to twenty years (Bowen), (2) offset disability benefit payments under a retirement system by the amount of worker's compensation benefits under a retirement system by the amount of worker's compensation benefits received from the same disability (Patterson); (3) require an employee who has membership in two public retirement systems to choose one and require that the system refund all contributions at the rate of 5% simple interest (Faulk), and (4) change an alternate retirement program of age 70 or 15 years service to a mandatory retirement at the age of 65 (Young)." Louisiana State Troopers Association, Inc. v. Louisiana State Police Retirement Board, 417 So.2d 440, 443-44 (La.App. 1 Cir.1982).[5]
Likewise, we hold that reemployment benefits for retirees can be modified prior to the point when the retirees become eligible for those benefits. Because these rights have neither "vested" nor "accrued," there is no due process violation, nor is there a violation of La. Const. Art. X, § 29(E)(5), by virtue of the enactment of La. R.S. 11:416.1. The statute does what the constitution allows, it alters "future benefit provisions of the state and statewide public retirement systems." La. Const. Art. X, § 29(E)(5).
The plaintiffs also point to Article X, § 29(B) of the Louisiana Constitution which states:
Membership in any retirement system of the state or of a political subdivision thereof shall be a contractual relationship between employee and employer, and the state shall guarantee benefits payable to a member of a state retirement system or retiree or to his lawful beneficiary. (Emphasis added.)
Because membership in LASERS expressly creates a "contractual relationship between employee and employer," plaintiffs argue that the application of La. R.S. 11:416.1 violates the Contracts Clauses of the United States and Louisiana Constitutions. See Lee Hargrave, "Statutory" and "Horatory" Provisions of the Louisiana Constitution of 1974, 43 La. L.Rev. 647, 674-75 (1983) ("Designating membership in a public retirement system a `contractual relationship' is an attempt to invoke the constitutional protection against impairment of the obligations of contracts"). The Contracts Clause, Article I, § 10(1) of the United States Constitution, provides: "No state shall ... pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligations of Contracts ..." Article I, § 23 of the Louisiana Constitution of 1974 provides: "No bill of attainder, ex post facto law, or law impairing the obligation of contracts shall be enacted." This Court has described these constitutional provisions as "virtually identical" and "substantially equivalent." Segura v. Frank, supra at 728; Board of Comm'rs v. Dept. of Natural Resources, 496 So.2d 281, 291 (La. 1986). "Although the language of each clause if facially absolute, its prohibition must be accommodated to the inherent police power of the state to safeguard the vital interests of its people." Segura v. *1109 Frank, supra (citing Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 410, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983)).
In Board of Comm'rs, supra, this court detailed "the appropriate Contract Clause standard" as enunciated by the Supreme Court in Energy Reserves, supra. Segura v. Frank, supra at 728-29. That standard requires a reviewing court to conduct the following four-step analysis: first, the court must determine whether the state law would, in fact, impair a contractual relationship; second, if an impairment is found, the court must determine whether the impairment is of constitutional dimension; third, if the state regulation constitutes a substantial impairment, the court must determine whether a significant and legitimate public purpose justifies the regulation; finally, if a significant and legitimate public purpose exists, the court must determine whether the adjustment of the rights and responsibilities of the contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption. Energy Reserves, supra, 459 U.S. at 410-413, 103 S.Ct. at 704-05; Segura v. Frank, supra at 729.
As to the first part of the test, although La. Const. Art. X, § 29(B) expressly states that membership in LASERS creates a "contractual relationship," this constitutional provision serves to expressly recognize the existence of a contract between the state and employee as to those retirement benefits that are vested. Upon their retirement, plaintiffs had a contract with the state for those retirement benefits that were vested. However, as explained above, the benefits provided by Act 455 were not retirement benefits, they were reemployment benefits, offering conditions under which a retiree could receive his retirement benefits and supplemental benefits, while at the same time receiving a full salary. In this case, none of the plaintiffs achieved sufficient service to fulfill these conditions, and thus these reemployment benefits had not vested. See generally 2 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law, Substance and Procedure, § 15.8 (3d Ed.1999) (explaining that the Contract Clause is traditionally used to invalidate statutes that retroactively impair contractual obligations). In fact, this Court has never utilized a Contract Clause analysis to invalidate changes to the state's retirement system which did not take away vested rights, and plaintiffs have presented insufficient grounds for us to consider doing so today. Indeed, as stated by the Rhode Island Supreme Court, "[w]e believe that converting the reemployment opportunities formerly available to these public pensioners into legally enforceable contract rights would `play havoc with basic principles of contract law, traditional contract clause analysis, and, most importantly, the fundamental legislative prerogative to reserve to itself the implicit power of statutory amendment and modification.'" Retired Adjunct Professors of the State of Rhode Island v. Lincoln C. Almond, Governor of the State of Rhode Island, 690 A.2d 1342, 1346 (R.I.1997)[6] (citing Pineman v. Oechslin, 195 Conn. 405, 488 A.2d 803, 808 *1110 (1985)). As we have found that plaintiffs have not met their burden under part one of the Contract Clause analysis that the statute impaired a contractual obligation, our Contract Clause analysis is at an end.[7]

CONCLUSION
La. R.S. 11:416.1, effective May 9, 2002, which specifically applies to state employees who retired and were rehired between June 30, 2001, and May 9, 2002, does not violate La. Const. Art. X, § 29, nor does it violate the due process or contract clauses of the Louisiana or United States Constitutions. The rights provided by Act 455, which was in effect when these plaintiffs retired and were rehired, effective June 30, 2001, were reemployment benefits which had neither vested nor accrued when the law was changed by La. R.S. 11:416.1.

*1111 DECREE
For the reasons expressed herein, the judgment of the trial court declaring La. R.S. 11:416.1 to be unconstitutional is reversed and the matter is remanded to the trial court for judgment consistent with this opinion.
REVERSED AND REMANDED.
KNOLL, J., dissents and assigns reasons.
WEIMER, J., dissents for the reasons assigned by KNOLL, J.
KNOLL, J., dissenting.
In this important policy making decision, the majority fails to seize the opportunity to recognize that the enactment of Article X, Sections 29(B) and (E)(5) reflects a judgment by the legislature and the people of this State that retirement benefits deserve greater protection from legislative modification. Instead, the majority continues to rely on jurisprudence arising before these provisions were added to our Constitution for the proposition that prior to the achievement of eligibility, a public employees' right to his or her retirement benefits is "inchoate" and details of a contributory retirement system can be modified to the "prejudice of the employee." In so doing, I find that the majority's views are unfortunately reminiscent of the "gratuity approach," whereby pensions are considered to be "gifts" from the state and errs in several respects.
The majority first errs in characterizing the benefits afforded under Act 455 as "reemployment benefits." In my opinion, these benefits are clearly retirement benefits as Act 455 restored membership in LASERS by requiring the remittance of both employer and employee contributions to LASERS based on the rate that applied to the retiree's position on the date of his reemployment. In addition, Act 455 permitted an employee's retirement allowance to be supplemented by an amount attributable to the service that occurred during reemployment and the average compensation calculated for the period of such employment. Indeed, the first sentence of La. R.S. 11:416.1 begins "a retiree who retired under the provisions of Act No. 455 of the 2001 Regular Session" and later continues "any person who retired under the provisions of Act. No. 455 of the 2001 Regular Session of the Legislature." (emphasis added).
What is more troubling to me, however, is the majority's treatment of Article X, Section 29(B). The majority announces that Article X, Section 29(B) "serves to expressly recognize the existence of a contract between the state and the employee as to those retirement benefits that vested." (emphasis added).[1] This statement confuses the relevant differences between "vesting" and "contractual" protection. As one court has properly recognized, "`vesting' and `contractual' are not synonymous." National Education Association Rhode Island v. Retirement Board of the Rhode Island Employees' Retirement System, 172 F.3d 22 (1st Cir.1999).
'[V]esting' refers to the period provided by a plan for which an employee must *1112 work to become eligible for a pension if and when he attains retirement age.... Whether a plan affords contractual protection against a change in its terms is a different question. A plan may not protect "vested" employees against change, or alternatively may provide some contractual protection even for unvested employees.
Id. at 28 (emphasis added).
Our constitution conclusively answers this question by expressly stating that membership in LASERS "shall be a contractual relationship."[2] Indeed, during the Louisiana Constitutional Convention of 1973, Delegate Aertker underscored the importance of providing contract clause protection to state employees' retirement benefits when he stated:
Well, Mr. Jenkins, it was the feeling of the committee, and after listening to people talk to us, that this matter of a retirement is quite a sensitive issue and that this would provide for many people a comfortable feeling that in the constitution of this state they felt that they had a provision which stated that their retirement actually represented a contractual relationship with this state, and that they had the full faith and credit of this state back of it to make sure that they, when they got old and dottering and feeble, that they were going to get that check every month and make sure it kept coming in, and they just like to see it written down in the constitution.
IX Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts, Dec. 5, 1973 at 2561. When later asked about the need for making membership in LASERS a "contractual relationship" since the Bill of Rights already prohibited the impairment of obligations, Delegate Aertker responded:
It ... it might, Mr. Jenkins, but I really believe the committee had in mind the provision in the Bill of Rights that the state could not impair the contract, and that's why they put the words in there "contractual relationship," with the understanding that if they put this and included it in the constitution, even in the Bill of Rights the state would not be able to impair it in any way, and that, therefore, it would be a contract that everyone understood they were operating under.
IX Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts, Dec. 5, 1973 at 2563.
Nevertheless, in spite of these statements, the majority notes that "this Court has never utilized a Contract Clause analysis to invalidate changes to the state's retirement system."[3] However, this case marks the first opportunity for this Court *1113 to address legislative modifications of state employees' retirement benefits since the enactment of Article X, Section 29(B), i.e., since the pronouncement that membership in LASERS "shall be a contractual relationship" was added to our Constitution in 1974. See Lee Hargrave, "Statutory" and "Hortatory" Provisions of the Louisiana Constitution of 1974, 43 La. L.Rev. 647, 674-75 (1983) ("Designating membership in a public retirement system a `contractual relationship' is an attempt to invoke the constitutional protection against impairment of the obligations of contracts"). Moreover, at least four state supreme courts have utilized a Contract Clause analysis to invalidate modifications to the state pension system and none of their constitutions contained provisions designating membership to be a "contractual relationship." See Bailey v. State, 348 N.C. 130, 500 S.E.2d 54 (1998); Oregon State Police Officers' Ass'n v. State, 323 Or. 356, 918 P.2d 765 (1996); Booth v. Sims, 193 W.Va. 323, 456 S.E.2d 167 (1994); Halpin v. Nebraska State Patrolmen's Retirement System, 211 Neb. 892, 320 N.W.2d 910 (1982).
The majority states that plaintiffs have presented "insufficient grounds" for this Court to consider utilizing a Contract Clause analysis to invalidate changes to the state retirement system. With this point, I most strongly disagree. As discussed in greater detail below, plaintiffs reasonably relied upon the substantial increase in benefits afforded under Act 455 in deciding whether to retire from public service. Nevertheless, the legislature, for no other reason than to correct its own financial miscalculations, enacted La R.S. 11:416.1 which retroactively divested these benefits less than a year after they were first offered. Even further, La. R.S. 11:416.1 was directed to a finite group of reemployed retirees whose continued receipt of the benefits under Act 455 did not threaten the actuarial soundness of the retirement system.

CONTRACT CLAUSE ANALYSIS
In my view, the majority applies the wrong test in addressing plaintiffs' Contract Clause claim. The United States Supreme Court has affirmed there exists "a dual standard of review" for impairment of contract cases. United States Trust Company of New York v. New Jersey, 431 U.S. 1, 26 n. 25, 97 S.Ct. 1505, 1519 n. 25, 52 L.Ed.2d 92 (1977) (citing Perry v. United States, 294 U.S. 330, 350-51, 55 S.Ct. 432, 435, 79 L.Ed. 912 (1935)); Caritas Services, Inc. v. Department of Social and Health Services, 123 Wash.2d 391, 869 P.2d 28, 35 n. 6 (1994). Impairments of a state's own contracts "face more stringent examination under the Contract Clause than would laws regulating contractual relationships between private parties." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 244 n. 15, 98 S.Ct. 2716, 2716 n. 15, 57 L.Ed.2d 727 (1978) (citing United States Trust Company v. State of New Jersey, 431 U.S. at 22-23, 97 S.Ct. at 1517 (1977)). See Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 413 n. 14, 103 S.Ct. 697, 705 n. 14, 74 L.Ed.2d 569 (1983) ("In the present case, of course, the stricter standard of United States Trust Co. does not apply because Kansas has not altered its own contractual obligations"). For both private and public contracts, the initial inquiry is whether the state law has in fact operated as a substantial impairment of a contractual relationship.[4] In contrast to *1114 the test for private contracts which next focuses on whether a significant and legitimate public purpose justifies the impairment, see Segura v. Frank, 93-1271 (La.1/14/94), 630 So.2d 714, the stricter Contract Clause standard for public contracts requires a determination as to whether the impairment is both "reasonable and necessary to serve an important public purpose." United States Trust Company, 431 U.S. at 25, 97 S.Ct. at 1519; Carlstrom v. State, 103 Wash.2d 391, 694 P.2d 1 (1985); MacLean v. State Board of Retirement, 432 Mass. 339, 733 N.E.2d 1053, 1058 (2000); Opinion of Justices, 135 N.H. 625, 609 A.2d 1204, 1210 (1992); Davies v. Minneapolis, 316 N.W.2d 498, 502 (Minn.1982); Buckman v. Montana Deaconess Hospital, 224 Mont. 318, 730 P.2d 380, 385 (1986); Halpin, 320 N.W.2d at 915; Parker v. Wakelin, 123 F.3d 1, 5 (1st Cir.1997); Maryland Teachers Ass'n v. Hughes, 594 F.Supp. 1353, 1361-62 (D.Md. 1984).

Substantial Impairment
In addressing plaintiffs' Contract Clause claim, the majority states that "there is no evidence that these plaintiffs suffered any detriment by virtue of Act 165." Again, I disagree. The majority is correct in concluding that if the plaintiffs wish to have their leave back, Option 2 of La. R.S. 11:416.1 provides them with that choice. Plaintiffs' compensatory time (or "K-time"), however, is gone for good. Indeed, the majority is simply wrong in stating that Option 2 "potentially" places them in the same position had they not retired. A review of the trial transcript reveals that K-time is an employer obligation that these employees lost forever by retiring under Act 455.
Mr. Torres (Counsel for LASERS):
These people retired and they didn't lose any of their benefits and when they testify-argue their loss, it was either converted to retirement benefit or converted to an actuarial cash benefit and they were given all the benefits they had accrued to that date. And that is very important. They lost no benefits by retiring. They got every benefit they were entitled to on the date of retirement. We paid them. Now
The Court: You paid them for sick leave and compensatory time?
Mr. Torres: Depending on the option we didn't do compensatory time. That's an employer responsibility.
The Court: Did you pay them for compensatory time?
Mr. Torres: We don't do compensatory time in the retirement system. That's an employer obligation. We use leave, annual and sick leave. Here is the two choices
The Court: So the answer to the question is no.
Mr. Torres: No, not for compensatory time.
The majority opinion goes on to explain that the loss of K-time "would have happened upon their retirement in any event by virtue of either a departmental policy and/or a Civil Service Regulation." However, the majority misses the point because both plaintiffs who testified at trial explained that they would not have retired had Act 455 not been in effect. The testimony at trial of plaintiff Gregg Smith particularly captures the special considerations unique to these plaintiffs.
Q. Did you take some action with respect to your job in February of this year?
A. Yes, I did.

*1115 Q. And what was that action?
A. I retired under the provisions of Act 455 and was rehiredI retired on a Friday and was rehired that Monday under the provisions of Act 455.
Q. When you signed the paperwork to do that, did you do it on two different days or all on the same day? How did that happen?
A. I signed the paperwork one day. I found out about the law in November or December of 2001. We did not know if it would be available to us or we would be eligible to be rehired. When we did find out, I did some investigation and after consulting with various people, I decided to retire under the Act 455.
* * * *
Q. You said you talked to some people about makingHow did you decide to make this decision?
A. Well, we were given some basic information from our personnel department about the provisions of the act. They told us the pros and cons, what we would benefit, things we would have to give up and
BY THE COURT:
Q. What were the pros and cons?
* * * *
A. I would be able to remain in my job, that after a period of twelve months I would get a retirement benefit and then during a thirty-six month period I would pay into a retirement program and remain part of the retirement program. If I stayed in service at least thirty-six months, the LASERS system would recalculate an additional benefit for me for retirement purposes ...
* * * *
COUNCIL FOR PLAINTIFFS:
Q. And so you studied Act 455 along with some advice from others?
A. Yes. I spoke to my wife. I sought out the advice of a certified public accountant. LASERS always says before you retire to please investigate it, to weigh the pros and cons and to seek the professional advice of a financial advisor and that's what I did.[5]
Thus, by retiring in order to obtain the benefits offered under Act 455, plaintiffs passed up the opportunity to use their accumulated K-time. Indeed, this is no small consequence, as Shannon Templet, Human Resources Manager for the Department of Public Safety and Corrections, testified that a combined total of over 11,800 hours of compensatory time was lost among the 161 plaintiffs. Accordingly, I agree that "at the very least, where the contract right or obligation impaired was one that induced the parties to enter into the contract and upon the continued existence of which they have especially relied, the impairment must be considered `substantial' for purposes of the Contract Clause." Baltimore Teachers Union v. Mayor of Baltimore, 6 F.3d 1012, 1016 (emphasis added). See also Christensen v. Minneapolis Municipal Employees Retirement Bd., 331 N.W.2d 740, 749 (Minn. 1983) ("In the realities of the modern employment marketplace, the state reasonably expects its promise of a retirement program to induce persons to accept and remain in public employment, and persons are so induced, and injustice can be avoided only by enforcement of that promise"); Spannaus, 438 U.S. at 244 n. 14, 98 S.Ct. 2716 (noting that the court in El Paso concluded that the "measure taken ... was a mild one indeed" because the buyer *1116 had not been substantially induced to enter into the contract); Andrews v. Anne Arundel County, 931 F.Supp. 1255, 1265 (D.Md.1996) ("The reliance which the aggrieved party placed on the contractual obligations appears to be the primary yardstick by which the degree of impairment is determined.").[6]
Reasonable and Necessary to Serve an Important Public Purpose
I further find the enactment of La. R.S. 11:416.1 was neither reasonable nor necessary to serve an important public purpose.[7] During oral arguments, counsel for LASERS explained that within months of Act 455's effective date, it quickly became apparent that the legislature had grossly underestimated the act's fiscal ramifications. As a result, the benefits provided under Act 455 had to be repealed because, as state employees began to retire and return to work, the financial figures reflected the retirement system in the long run could not afford the substantial increase in benefits.[8] To make certain, I agree that maintaining the fiscal integrity of the state retirement system is an important public purpose. Indeed, Article X, Section 29(E)(1) of the Louisiana Constitution of 1974 declares: "The actuarial soundness of state and statewide retirement system shall be attained and maintained and the legislature shall establish, by law, for each state or statewide retirement system, the particular method of actuarial valuation to be employed for purposes of this Section." Furthermore, this Court has acknowledged that "[c]hanges in details, such as length of service required, contributions needed, and age requirements, to keep the fund on sound actuarial practices, are essential." Bowen, 76 So.2d at 435. Accordingly, because Act 455 had the potential to threaten the actuarial soundness of LASERS, I have no trouble finding that the legislature reacted reasonably in reinstating the original three irrevocable options for reemployed retirees. See Maryland State Teachers Association v. Hughes, 594 F.Supp. 1353, 1368 (D.Md.1984) ("A pension system need not be actuarially unsound before the legislature may move to change the system and the benefits it provides its members.").
However, the legislature did not stop there. Instead of simply preventing future retirees from draining the system, the legislature went one step further by enacting La. R.S. 11:416.1 to retroactively alter the benefits of those state employees who *1117 had retired and been reemployed during the few months Act 455 was in effect. I agree with the courts that have held where an enactment appears to be "tailored to modify a particular contractual obligation, rather than to be part of a broad public program which incidentally has the effects of impairing the particular contract," it cannot be deemed to have been reasonable to serve the governmental goal. United Firefighters of Los Angeles City v. City of Los Angeles, 210 Cal.App.3d 1095, 1115, 259 Cal.Rptr. 65 (1989) (citing Continental Ill. Nat. Bank v. State of Washington, 696 F.2d 692, 702 (9th Cir.1983)).[9]
Nevertheless, even assuming that the enactment of La. R.S. 11:416.1 was reasonable, the enactment of La. R.S. 11:416.1 was clearly unnecessary. The necessity prong of the analysis focuses on whether "a less drastic modification" would have been sufficient to achieve the government goals. United States Trust Company, 431 U.S. at 29-30, 97 S.Ct. at 1521; Bailey, 500 S.E.2d at 67; East Prince Frederick Corporation v. Board of County Commissioners, 320 Md. 178, 577 A.2d 27, 30 (1990); Fidelity Union Trust Company v. New Jersey Highway Authority, 85 N.J. 277, 426 A.2d 488, 494 (1981). As declared by the United States Supreme Court, "[a] State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well." United States Trust Company, 97 S.Ct. at 1527. Thus, I note with significance that counsel for LASERS conceded at oral arguments that the continued receipt by these 161 plaintiffs of Act 455's benefits, while costly, did not threaten the actuarial soundness of the retirement system. See Halpin, 320 N.W.2d at 915 ("That the maintenance of a retirement plan is heavily burdening a governmental unit has not itself been permitted to serve as justification for a scaling down of benefits figuring in the contract...."); Andrews, 931 F.Supp. at 1266 ("Although I have no doubt that maintaining the `actuarial soundness' of the [County Retirement Plan for Appointed and Elected Officials] is an important purpose, the County has failed to make a sufficient showing that the means which it adopted to address its `problem' is the lease drastic available."). Under these circumstances, I readily find that the enactment of La. R.S 11:416.1 was neither reasonable nor necessary to rectify the problems created by the legislature's own financial miscalculations. See United Firefighters of Los Angeles, 210 Cal. App.3d at 1113, 259 Cal.Rptr. 65 (approving the trial court's conclusion that a "public entity cannot justify the impairment of contractual obligations on the basis of the existence of a fiscal crisis created by its own voluntary act").

CONCLUSION
Because of the lower pay that inevitably comes with public service, the benefits offered through state pension plans are undoubtedly one of the primary reasons state *1118 governments can attract and retain better employees. R. Cohn, Public Employee Retirement PlansThe Nature of Employees' Right, 1968 Ill. Law Forum 32, 40 (1968). As expressed by the Minnesota Supreme Court, "[r]etirement plans are now an accepted and expected part of one's employment ... Employees in the public sector undertake employment, at times on less favorable terms than in the private sector, with the expectation that they will have a measure of security in their retirement years." Christensen v. Minneapolis Municipal Employees Retirement Board, 331 N.W.2d 740, 747 (Minn.1983). Closer to home, this point was echoed during the debates surrounding the designation of a "contractual relationship" in LASERS. Delegate Morris explained:
We are in a position to do something for public employees, and if it's wrong to say that you're entitled to a certain benefit when you retire that you preagree upon, and you have no opportunity not to join the system; you have to join the system ... But, surely, surely, working people who work on salaries all their life have no opportunities to save much money. Most of the monies that they would save are in a retirement system or in their home, and if they can't be assured in later life when they can't earn or their earning capacity is far below what it was a few years ago, this is the only thing they have to count on. Certainly, I would hope that we would guarantee our state employees that the full faith of the state is behind their retirement system.
IX Records of the Constitutional Convention of 1973: Convention Transcripts, Dec. 5, 1973 at 2578-79. Similarly, Delegate Flory added:
Let me say this: one of the reasons that the state today can employ personnel is because of the retirement systems that they do have. Certainly the pay that they receive is not commensurate with their counterpart in private industry.
IX Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts, Dec. 5, 1973 at 2578.
For these reasons, state supreme courts have moved away from the "gratuity approach" and have begun to protect the expectations of pension plan members. See Andrew Mackenzie, Spiller v. State: Determining the Nature of Public Employees' Rights to Their Pensions, 46 Me. L.Rev. 355, 358 (1994). As one commentator explains:
Many states have fully rejected the gratuity theory as outdated. Most of those states now use some form of a contract theory to enforce the rights of public employees to their pensions....
Id. at 359 (emphasis added). In my view, this case presents a classical situation for a traditional contract clause analysis, especially in light of the fact that our constitution now expressly designates membership in LASERS to be a "contractual relationship." See Hargrave, supra, at page 676 ("the basic approach is to balance the intensity of the individual interest against the intensity of the governmental interest, in the style of the current flexible contracts clause analysis"). Act 455 had to be repealed only ten months after it was enacted because the legislature had underestimated its costs to LASERS. While the legislature acted reasonably in returning the three irrevocable options, the enactment of La. R.S. 11:416.1, which retroactively altered the pension provisions of plaintiffs who had been induced into retiring by the increase in benefits under Act 455, was neither reasonable nor necessary to maintain the actuarial soundness of the retirement system. Under these facts, I would hold that La. R.S. 11:416.1, as enacted by Act 165 of the 2002 First Extraordinary Session, violates Article X, Section *1119 29(B) of the Louisiana Constitution of 1974.
For the foregoing reasons, I respectfully dissent.
NOTES
[1] La. R.S. 11:416, as amended by Acts 455, provided in full:

A. Any retiree shall be eligible to be reemployed by any employer agency in a position covered by the retirement system without a suspension of benefits, provided the retiree has been retired for a period of at last twelve months from the effective date of his retirement. The twelve-month period that occurs immediately following the effective date of retirement of each retiree, shall be know as the "waiting period."
B. The retiree and the appointing authority of the employer agency covered by this system shall immediately notify the system of the retiree's date of employment, the amount of his starting salary, any subsequent changes in salary, and the date of termination of employment.
C. (1)(a)(i) If any employer agency covered by the retirement system employs a retiree within the waiting period, then the benefits of the retiree shall be suspended for twelve months.
(ii) The twelve months of suspended benefits shall occur regardless of whether the suspension occurs during twelve consecutive months or during twelve joined months where there are multiple periods of such reemployment.
(b)(i) Upon reemployment of a retiree, the employer shall remit employer contributions to this system based on the employer contributions rate that applies to the reemployed retiree's position on the date of such reemployment. Additionally, the employer shall withhold employee contributions from the reemployed retiree's compensation based on the employee contribution rate that applies to the reemployed retiree's position on the date of such reemployment and remit such contributions to this system.
(ii) Upon termination of reemployment, if the reemployed retiree had worked and contributed to the system for at least thirty-six months, then his retirement allowance shall be increased by an amount that is attributable to the service that occurred during reemployment and the average compensation that is calculated for the period of such reemployment. The increased retirement allowance shall be calculated based upon the provisions of this Chapter that are in effect on the date of reemployment. In no event shall such a retiree's original retirement allowance, when combined with the increased retirement allowance, exceed the average compensation which is calculated for the period of reemployment.
(iii) Upon termination of reemployment, if the reemployed retiree had worked and contributed to the system for less than thirty-six months, then the employee contributions paid during the period of reemployment shall, upon application, be refunded to the retiree.
(c) Any retiree who is employed by an employer agency covered by this system on June 30, 2001, shall be exempt from the suspension of benefits, without regard to whether the retiree's effective date of reemployment occurred during the waiting period.
(2) Employers failing to submit the report required by Subsection B of this Section shall be liable for the repayment of contributions due to the system from the date of reemployment until such time as the report is filed.
[2] La. R.S. 11:416, as amended by Act 165, now provides, in pertinent part:

A. Regardless of age, if a retiree of the system is engaged or hereafter engages in employment which otherwise would render him eligible for membership in the system, he shall choose one of the following irrevocable options:
(1)(a) Option 1. Any person on regular retirement under the Louisiana State Employees' Retirement System may be employed in any position covered by the system during any fiscal year, provided that his earnings in such employment do not exceed fifty percent of his annual retirement benefit for such fiscal year. For the purposes of this Section, there shall be an annual cost-of-living adjustment to the annual retirement benefit figure used in these computations. This cost-of-living adjustment shall be based upon and directly reflect the annual percentage increase or decrease in the Consumer Price Index for all Urban Consumers for the preceding year. The retiree may continue to receive his benefit until he earns more than fifty percent of his annual retirement benefit as defined herein, during any fiscal year, after which his retirement benefits shall be reduced so that the total reduction equals the amount earned in excess of fifty percent of his annual retirement benefit as adjusted under this Section. Retirees choosing this option shall not become contributing members of this system.
(b) Notwithstanding the provisions of this Section or any other provision of law to the contrary, any retiree of the system who has at least thirty years of service credited to his account and is at least age seventy shall be exempt from any suspension or reduction of benefits received from this system as the result of reemployment.
(2) Option 2. The retiree may regain membership by repaying all retirement benefits received from the system, plus interest thereon at the actuarial rate approved by the board of trustees of the system compounded annually from date of receipt until paid. In addition, the retiree shall pay into the system an amount equal to the employee and employer contributions which would have been paid had the retiree become a member at the commencement of the resumption of covered employment, plus interest thereon at the actuarial rate compounded annually from date of service until paid. Upon such regaining of membership, he shall have restored to his credit all service standing to his credit at the time of retirement and shall receive service credit for all service rendered since becoming so reemployed and thereafter shall be subject to the same conditions as are other members of the system which are not in conflict herewith.
(3) Option 3. The retiree may request immediate suspension of his benefit and become a member of this system, effective on the first day or reemployment. Upon such regaining of membership, he shall contribute thereafter at the current contribution rate as applicable to his position. Upon subsequent retirement, his suspended retirement allowance shall be restored to full force and effect. In addition, if he has worked and contributed for at least thirty-six months, his retirement allowance shall be increased by an amount attributable to his service and average compensation since reemployment based on the computation formula in effect at the time of subsequent retirement. If he has been reemployed for a period less than thirty-six months, upon termination of reemployment the contributions paid by the retiree since his reemployment shall, upon application, be refunded to the retiree. In no event shall the member receive duplicate credit for unused sick and annual leave that had been included in the computation of his original retirement allowance. Any supplemental benefit shall be based on reemployment service credit only and shall not include any other specific amount which may otherwise be provided in the regular retirement benefit computation formula. In the event of the member's death prior to subsequent retirement, payment benefits to the designated beneficiary or survivor shall be in accordance with the option selected by the member at the time of his original retirement. No change in the option originally selected by the member shall be permitted except as provided in R.S. 11:446(C). In no event shall the supplemental benefit exceed an amount which, when combined with the original benefit, equals one hundred percent of the average compensation figure used to compute the supplemental benefit. Under no circumstances shall any person who has regained membership pursuant to the provisions of this Paragraph be allowed to purchase service credit for any period employed in the state service during which he continued to draw his retirement.
...
[3] La. R.S. 11:446 allows a retiree to select among certain options providing different modes of payment by which retirement benefits may be paid.
[4] It is important to note that by the language of Act 165, it is apparent that the legislature was aware of its authority. Section 2 of Act 165 provides that La. R.S. 11:416.1 is only applicable "to any person who retired on or after June 30, 2001." It further provides that "this Act shall have no effect upon any person who retired prior to the effective date of Act No. 455 of the 2001 Regular Session of the Legislature. Those individuals who were reemployed and receiving retirement benefits when this Act becomes effective shall continue to receive such benefit." This is appropriate because Act 455 provided at La. R.S. 11:416(C)(1)(c) that "any retiree who is employed by an employer agency covered by this system on June 30, 2001, shall be exempt from the suspension of benefits, without regard to whether the retiree's effective date of reemployment occurred during the waiting period." These people immediately vested in the benefit and therefore under the appropriate interpretation of the constitutional provision could not have their benefits "diminished or impaired."
[5] Although plaintiffs argue that these cases are not controlling because they were decided before the 1987 Constitutional Amendment of La. Const. Art. X, § 29(E)(5), the result in these cases would have been the same under that amendment because the employees' rights in those cases had not yet "accrued."
[6] In this case, professors at a state university retired relying on a state statute that allowed them to be reemployed by the state for up to 75 full days or 150 half days before their pension payments would be suspended. After they retired and became reemployed, the legislature changed the statute to provide that the reemployed retirees' salary could not exceed $10,000 in one calendar year without their pension being suspended. The Rhode Island Supreme Court held that the legislature was free to enact retrospective legislation in this situation because, in doing so, it did not impair any contractual obligations or interfere with any of plaintiffs' vested rights. 690 A.2d at 1348.
[7] We note plaintiffs' argument that their rights were substantially impaired by the enactment of Act 455. Certain plaintiffs testified that after Act 455 was enacted, they contemplated its provisions and discussed the benefits with their families and financial advisors before making the determination to retire and then seek reemployment. However, "[s]tate regulation that restricts a party to the gains it reasonably expected from the contract does not necessarily constitute a substantial impairment." Segura v. Frank, supra at 729 (citing Energy Reserves, supra, 459 U.S. at 411, 103 S.Ct. at 704). Furthermore, the Department of Corrections was under no contractual or other legal obligation to rehire these state employees once they retired, thus any loss they suffered as a result of retiring was a known risk which they knowingly undertook.

Finally, there is no evidence that these plaintiffs suffered any detriment by virtue of Act 165. These plaintiffs, under La. R.S. 11:416.1 as enacted by Act 165, must now make an election to retain the right to earn a supplemental benefit after thirty-six months of service credit and suspend receipt of the retirement benefit under Option 3, or elect to collect a retirement benefit after twelve months of service credit and give up the right to a supplemental benefit under Option 4. If the member feels that neither option is to his or her benefit, then under Option 2 the retiree may rejoin LASERS as if he or she had not retired and continue accruing benefits under the same Plan Document that they were under prior to retirement.
Plaintiffs also argue that by choosing to retire and then seek reemployment, they lost any annual and sick leave time that had accrued to their credit. However, this leave was converted to retirement credit pursuant to La. R.S. 11:424 and would have happened upon their retirement regardless of the existence of Act 455. Further, if these plaintiffs wish to have their leave back, Option 2 of La. R.S. 11:416 provides them with that choice. Similarly, plaintiffs complain that by virtue of being induced to retire and seek reemployment by Act 455, they lost their compensatory time, known as "K-time." However, this would have happened upon their retirement in any event by virtue of either a departmental policy and/or a Civil Service Regulation. There is no provision in the Plan Document that provides for a payment by LASERS or conversion to retirement credit for K-time. Once again, if a plaintiff wishes to have his or her K-time back, Option 2 potentially places him in the same position he would have been in had he not retired. Finally, plaintiffs argued that an employee's anniversary dates could have been changed by virtue of their retirement and reemployment, as induced by Act 455. Civil Service Regulations provide that if an employee misses one working day in between retiring and returning to work, that employee's anniversary date would be six months from their reemployment date. As the Human Resources Manager for the Department of Public Safety and Corrections testified:
So employees ... say they retired on January 20th. If their original anniversary date was due in April, that's their annual raise. You get your annual merit increase if you meet performance standards on your anniversary date. If it was due on April, now their anniversary date was moved until July.
Hence, it would now take longer for an employee to receive their merit increase under those circumstances. However, there is no evidence of any particular plaintiffs who were victims of this particular circumstance, and, once again, Option 2 would appear to offer them some relief if necessary.
[1] Citing Article X, Section 29(E)(5), the majority explains: "The statute does what the constitution allows, it alters `future benefit provisions of the state and statewide public retirement systems.'" In my view, this is a misreading of the statute because it places too much emphasis on the word "future," while ignoring important surrounding language. Indeed, the provision does not say "the legislature may alter future benefits." Rather, it says that "future benefit provisions" of LASERS "shall only be altered by legislative enactment." Thus, I believe that this section is not a grant of power, but instead merely creates a constitutional prohibition against permitting the Board of Trustees to alter retirement benefitsretirement benefit provision can only be altered by the legislature.
[2] The United States Supreme Court has recognized that "absent a clear indication that the legislature intends to bind itself contractually," the presumption is that a law is not intended to create "contractual or vested rights." National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co., 470 U.S. 451, 466, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985). To me, the enactment of Article X, Section 29(B) could not have made that intent any clearer.
[3] The majority then cites a case arising from the Rhode Island Supreme Court for the proposition that "converting the reemployment opportunities formerly available to these public pensioners into legally enforceable contract rights would `play havoc with basic principles of contract law, traditional contract clause analysis, and, more importantly, the fundamental legislative prerogative to reserve to itself the implicit power of statutory amendment and modification.'" Retired Adjunct Professors of the state of Rhode Island v. Lincoln C. Almond, Governor of the State of Rhode Island, 690 A.2d 1342, 1346 (R.I.1997). Significantly, the majority fails to mention that, unlike the Louisiana Constitution, the Rhode Island Constitution does not contain a provision stating that membership in the state retirement system is a "contractual relationship."
[4] Some courts have described this prong of the analysis as involving three components: (1) does a contractual relationship exist, (2) does the change in the law impair that contractual relationship, and if so, (3) is the impairment substantial? See, e.g., Parker v. Wakelin, 123 F.3d 1 (1st Cir.1997); Koster v. City of Davenport, 183 F.3d 762 (8th Cir. 1999). However, because our constitution expressly declares there to be a "contractual relationship," it only needs to be determined whether the impairment was "substantial."
[5] Similarly, plaintiff Cornel Hubert, testified at trial:

Well, I talked to my human resources director after learning about the program or the law, went home for that weekend and my wife and I discussed it. We looked at itI looked over the pros and cons of doing this and the decision was to go through with it.
[6] The majority opinion cites Segura v. Frank, supra, for the proposition that "state regulation that restricts a party to gains it reasonably expected from a contract does not necessarily constitute a substantial impairment." I believe this blanket pronouncement clearly did not have the particular facts of this case in mind. Although this Court has upheld numerous challenges to legislative modifications of the state retirement system, in each instance the legislature altered the pension provisions of state employees before retirement, such as by reducing the contribution rate or increasing the mandatory years of service. In my opinion, it is one matter to adjust employees' retirement packages years before they retireit is quite another matter to retroactively withdraw the benefits reasonably relied upon by state employees in making life impacting decisions.
[7] In applying this standard, the United States Supreme Court has stated that "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self interest is at stake." United States Trust Company, 431 U.S. at 25, 97 S.Ct. at 1519; Segura, 630 So.2d at 732. "If a State could reduce its financial obligations whenever it wanted to spend money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all." United States Trust Company, 431 U.S. at 25, 97 S.Ct. at 1519.
[8] As counsel matter-of-factly stated, "When the numbers started coming in, we went 'whoops.'"
[9] For example, in Allied Structural Steel Company v. Spannaus, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), the Supreme court addressed a statute which subjected private employers of 100 employees or more who provided pension benefits under a plan meeting the qualifications the Internal Revenue Code to a "pension funding charge" if he terminated the plan or closed a Minnesota office. Intended to protect discharged workers, the statute essentially required employers to assure all employees of at least ten years standing a full pension regardless of the vesting provisions of any existing plan. In the end, the Court held that the Minnesota pension law violated the Contract Clause because the State "had not acted to meet an important general social problem. The pension statute had a very narrow focus: it was aimed at specific employers." Energy Reserves, 459 U.S. at 412 n. 13, 103 S.Ct. at 705 n. 13 (explaining its holding in Allied Structural Steel).